1          IN THE UNITED STATES DISTRICT COURT
            IN AND FOR THE DISTRICT OF DELAWARE
2
   NATURAL ALTERNATIVES INTERNATIONAL, )  Civil Action
3  INC., et al.,                        )
                                        )
4              Plaintiffs,              )
                                        )
5         v.                            )
                                        )
6  VITAL PHARMACEUTICALS, INC., et al., )
                                        )
7              Defendants.              )  No. 09-626-GMS

8                      -  -  -

9  VITAL PHARMACEUTICALS, INC.,         )
                                        )
10              Counterclaim/Third-     )
                Party Plaintiff,        )
11                                      )
          v.                            )
12                                      )
   NATURAL ALTERNATIVES                 )
13 INTERNATIONAL, INC., and COMPOUND    )
   SOLUTIONS, INC.,                     )
14                                      )
                Counterclaim/Third-Party )
15              Defendants.             )

16                     -  -  -

17 COMPOUND SOLUTIONS, INC.,            )
                                        )
18              Third-Party Plaintiff,  )
                                        )
19        v.                            )
                                        )
20 DNP INTERNATIONAL CO., INC.,         )
                                        )
21              Defendant.              )

22                     -  -  -
                    Wilmington, Delaware
23               Thursday, May 12, 2011
                       9:30 p.m.
24                 Markman Hearing

25
   BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge

1
**APPEARANCES:**

2
            DAVID E. MOORE, ESQ.
3           Potter Anderson & Corroon LLP
                        -and-
4           SCOTT A.M. CHAMBERS, ESQ.
            RICHARD OPARIL, ESQ.,
5           WILLIAM JOHN McKEAGUE, ESQ. (McLean, VA), and
            KEVIN M. BELL, ESQ.
6           Patton Boggs LLP
            (Washington, D.C.)
7
                        Counsel for Plaintiffs
8
            FRANCIS DiGIOVANNI, ESQ., and
9           KEITH A. WALTER, JR., ESQ.
            Connolly Bove Lodge & Hutz LLP
10
                        Counsel for Defendant
11                      Vital Pharmaceuticals, Inc.

12  **APPEARANCES CONTINUED:**

13          PILAR KRAMAN, ESQ.
            Young Conaway Stargatt & Taylor, LLP
14                      -and-
            STEVEN R. HANSEN, ESQ.
15          Lee Tran & Liang APLC
            (Los Angeles, CA)
16
                        Counsel for Defendant
17                      DNP International, Inc.

18

19

20

21

22

23

24

25

1            THE COURT:  Good morning, counsel.  Counsel,

2    please take your seats.

3            Why don't know we start out with a round of

4    reintroductions, beginning with plaintiff.

5            MR. MOORE:  Good morning, Your Honor.  David

6    Moore from Potter Anderson on behalf of the plaintiffs.

7    With me today, closest to me Scott Chambers, John McKeague,

8    Richard Oparil, and Kevin Bell from Patton Boggs.

9            THE COURT:  Good morning.

10           (Counsel respond "Good morning.")

11           THE COURT:  Mr. DiGiovanni, good morning.

12           MR. DiGIOVANNI:  Good morning, Your Honor.

13   Frank DiGiovanni from Connolly Bove.  With me representing

14   one of the two defendants, Vital Pharmaceuticals, is my

15   partner Keith Walter.

16           THE COURT:  Mr. Walter.

17           MR. WALTER:  Good morning, Your Honor.

18           THE COURT:  Counsel.

19           MS. KRAMAN:  Good morning, Your Honor.

20           THE COURT:  Good morning.  I don't think we have

21   had the pleasure.

22           MS. KRAMAN:  Pilar Kraman from Young Conaway.  I

23   am here representing DNP International.  With me is Steve

24   Hansen.

25           MR. HANSEN:  Good morning, Your Honor.

1           THE COURT:  Good morning.

2           Counsel, it seems like we have allotted four

3    hours for this.

4           MR. CHAMBERS:  Yes, Your Honor.

5           THE COURT:  If memory serves.  I certainly hope

6    we don't take four hours.  If it is looking like we are

7    going to need the full allotment, I am probably going to

8    want to break for lunch around 12:30.  If you think we can

9    get finished by 1:00, that would be a good thing.

10   Otherwise, I am going to get hungry and irritable after

11   that.  I am being a little facetious.

12          Have you discussed among yourselves how you

13   would like to proceed this morning?

14          MR. CHAMBERS:  Yes, Your Honor, we have, at

15   least in the beginning.  We have agreed to the fact that the

16   terms beta-alanine and L-histidine should be construed

17   together.  And then plaintiffs believe that active

18   derivative should be construed at the same time.  But

19   defendants believe that it should be construed separately.

20          THE COURT:  When you say construed, you mean

21   argued.

22          MR. CHAMBERS:  Argued, yes.

23          THE COURT:  I guess I do the construing and you

24   do the arguing.

25          MR. CHAMBERS:  I am sorry.

1          The reason is, a lot of the evidence that goes

2     to describing what an active derivative is also supports

3     plaintiffs' view of what beta-alanine is.  So we think it

4     makes most sense to put them together.

5          We could either go term by term or we could go

6     all at once and you could pepper the argument with questions

7     as we go through, or however you would like to do it.

8          THE COURT:  Well, on the term-by-term point, do

9     counsel have an agreement as to process on that?

10          MR. DiGIOVANNI:  Your Honor, actually, we had

11     agreed that we would go term by term.  I thought the only

12     disagreement was whether to include within the

13     beta-alanine/L-histidine argument the argument with regard

14     to active derivative.

15          MR. CHAMBERS:  I hadn't heard that before.

16          THE COURT:  Is term by term acceptable to

17     plaintiff?

18          MR. CHAMBERS:  Term by term will be fine,

19     especially if we can keep the three together.

20          THE COURT:  Let's talk about that for a minute.

21          MR. DiGIOVANNI:  Your Honor, we did not brief

22     the three together.  The L-histidine and beta-alanine were

23     briefed together.  And we believe that active derivative

24     should be handled separately, although immediately after the

25     beta-alanine and L-histidine argument.  I think there are

1    certainly some differences between what ought to be used to

2    construe those claims or that particular claim term.

3              THE COURT:  When you say what ought to be used,

4    what are you talking about?

5              MR. DiGIOVANNI:  I am talking about the

6    various -- well, active derivative is actually a term that

7    didn't come until one of the later patents.  It doesn't even

8    appear in the first patent.  So I think some of the

9    arguments that are going to be made don't pertain to active

10   derivative.

11             So we think the beta-alanine and L-histidine

12   should be handled separately, or else there is going to be

13   some issues that could get confused together.  We think,

14   just like in our briefing, they ought to be handled

15   separately, although immediately thereafter.

16             MR. CHAMBERS:  Your Honor, when you look at our

17   briefing, you find that some of our discussion of active

18   derivative, in fact, the way that we interpret active

19   derivative is within the context of the claims.

20             Now, active derivative goes to a Markush group,

21   and the Markush group and says a beta-alanine, an ester of

22   beta-alanine, or an amine of beta-alanine.  So active

23   derivative has to go with those three terms.  Otherwise,

24   it's just, you know, trying to determine what it means in a

25   vacuum.

1          THE COURT:  You are essentially saying just what

2     he just said:  The Court needs context, essentially, in

3     order to properly construe.

4          MR. CHAMBERS:  Yes.  We will be repeating some

5     of the same evidence if we do it --

6          THE COURT:  What if any prejudice would either

7     defendant suffer were I to accept the approach, not talking

8     about the substantive arguments, just the approach that is

9     being suggested by plaintiff?

10         MR. DiGIOVANNI:  Your Honor, I would say there

11    is no prejudice.  I would just say from an organizational

12    standpoint, it's better to take the active derivative term

13    separately.

14         THE COURT:  Do you think it will confuse things

15    for me?

16         MR. DiGIOVANNI:  Not for you, Your Honor.  I

17    just think, generally, most of the record does not overlap

18    in terms of active derivative, so it makes sense to keep it

19    together.

20         THE COURT:  Here is what I will do.  I am going

21    to accede to the urgings of plaintiffs' counsel.  To the

22    extent that defendants want to call out differences or

23    reasons why I should be mindful of the fact that active

24    derivative was not included in the briefing in the manner

25    suggested or that it is going to be presented today and to

the extent that that will inform my efforts, I will

certainly wait on that.

So that is what we will do.

I notice one of the parties included some

guidance in its discussion of the applicable law on

extrinsic evidence, I am not sure which one, I don't

remember. I wanted to make sure its clear, and I know you

know this, Mr. DiGiovanni, and hopefully other counsel as

well, of my typical practice in this regard. It is probably

called out, I think, in citing to Vitronics, I believe, that

to the extent that extrinsic evidence will help the Court

understand the technology, I am willing to hear that. But I

am not going to hear extrinsic evidence today. I am just

raising that as a point so I don't have to field objections

or deal with efforts at presenting extrinsic evidence

outside of the dictionary context that may be offered to

help me understand the technology. I don't think I am going

to need that because I know I have able counsel here who are

going to do a good job of tutoring me on the chemistry

involved.

Any questions about that or concerns?

MR. CHAMBERS: Your Honor, we will present it

just so it covers intrinsic evidence.

THE COURT: That is what I am telling you to do,

unless you have an argument that you want to make to me --

Judge, there is cause for you to hear this and the cause is

that it's going to help you understand the technology.

MR. DiGIOVANNI:  We did cite to some

dictionaries for one of the terms.

THE COURT:  That is fine.

MR. DiGIOVANNI:  And to one concurrent patent

with one of the other terms.

THE COURT:  Are you going to have difficulty

with that?

MR. CHAMBERS:  If they are going to bring in

patents outside the family, we will probably want to raise

an objection.

THE COURT:  That is fine.

MR. CHAMBERS:  And we will want to address it.

THE COURT:  Unless offered within the context

that I just discussed, I won't accept that evidence.

MR. CHAMBERS:  For that reason, Your Honor, I

won't bother to do it, since I am going to be going first.

THE COURT:  Counsel.

MR. HANSEN:  Your Honor, this seems related.  We

have a few introductory slides that are depictions of some

of the molecules and a depiction of the pathway.

THE COURT:  Those are demonstratives.  Right?

MR. HANSEN:  I want to make clear that is okay.

THE COURT:  I am talking about evidence, not

1    demonstratives.

2              Any other housekeeping matters?

3              Here, we will do it term by term.  I will give

4    the plaintiff the last word on a brief rebuttal to the

5    defendants' positions on the various terms.

6              MR. CHAMBERS:  Your Honor, thank you.

7              MR. DiGIOVANNI:  Your Honor, one additional

8    thing.  I have conferred with my co-defendant's counsel, and

9    we have designated a lead person to take the argument for

10   each of the various terms.

11             THE COURT:  Okay.

12             MR. DiGIOVANNI:  The other party may have

13   something to add afterwards.  So we have designated a lead

14   person.  And in addition, Mr. Hansen is going to do a brief

15   technology tutorial.

16             THE COURT:  Okay.

17             Are you asking me to find out whether the

18   plaintiff would have any objection to a little supplementing

19   to the lead's position?

20             MR. DiGIOVANNI:  To the extent Your Honor finds

21   it objectionable -- the two defendants are separate.  So I

22   thought Your Honor's practice was to allow each defendant

23   to --

24             THE COURT:  You can.  But if you designated a

25   lead as a timesaving device, that's great.

1           MR. DiGIOVANNI:  I wanted to let you know, that

2  is what we have done.

3           THE COURT:  So I don't have to hear repetitive

4  arguments.

5           MR. CHAMBERS:  Our only objection would be if

6  they are repetitive -- there was a single brief that we were

7  responding to, that was a combined brief.  If they are going

8  to be repetitive about some of these things, that would

9  trouble us.

10          THE COURT:  That is fine.  Just as in an

11  evidentiary proceeding, if you have objections, the fact of

12  the matter is that while we are not formally presenting

13  evidence, this Court is going to be asked to find some

14  facts, in spite of the de novo standard.

15          My little dig there.

16          Let's go, counsel.

17          MR. CHAMBERS:  Thank you, Your Honor.  Good

18  morning.

19          This invention at its most basic level is a

20  nutritional supplement that let's you work out longer with

21  less soreness.

22          THE COURT:  Counsel, please don't be

23  disconcerted if from time to time I turn my attention to the

24  computer.  I am listening.

25          MR. CHAMBERS:  Yes, Your Honor.

1              The patents in suit use beta-alanine and

2    L-histidine, which are two amino acids.  Amino acids are the

3    building blocks of peptides and proteins.  Dipeptides have

4    two amino acid residues that are covalently joined.

5    Oligopeptides have a few amino acid residues covalently

6    joined.  And polypeptides are many amino acid residues

7    covalently joined.

8              Because a dipeptide is two residues and a

9    tripeptide is three residues and a tetrapeptide is four

10   residues, sometimes a single residue is referred to as a

11   monopeptide.

12             Now, structurally, these are found on the next

13   slide, where we have one of the --

14             THE COURT:  Did you bring binders?

15             MR. CHAMBERS:  I am sorry.  We did.  I will be

16   happy to pass those up.

17             THE COURT:  If you could provide us with two

18   copies.

19             MR. CHAMBERS:  We see in this slide the key

20   molecule of this patent, which is beta-alanine.  And

21   beta-alanine has an amino side and it has a hydroxyl side.

22   The patent also describes beta-alanine esters.  And those

23   are, the beta-alanine when it's joined, it no longer has

24   this hydroxyl but instead it has an ester linkage.

25             It also talks about beta-alanine amides.  That's

1    when it has an amino or an amide group here instead of this

2    hydroxyl.

3            When those are combined into a dipeptide, you

4    get the substance that is down in the lower corner, or lower

5    left-hand corner, and that's one of the molecules that's

6    also discussed in the patent.  And you can see that in this

7    molecule, this dipeptide, the beta-alanine no longer is in

8    the same form as it was up here.  It has lost a hydroxyl.

9    It is no longer a beta-alanine.  Instead, it is a residue.

10   And the art calls it an amino acid residue rather than

11   calling it an amino acid.

12           Now, the prior art disclosed dipeptides, such as

13   this carnosine, used in the manner that the patents

14   described.  But the prior art didn't describe using the

15   amino acids.

16           The inventors of the patent in suit invented a

17   way to avoid muscle fatigue by regulating the ion

18   concentration using the amino acids beta-alanine as well as

19   L-histidine.  These are the residues of those two.  And you

20   could regulate this using these amino acids rather than

21   dipeptides.  It was already known that you could use

22   dipeptides.  But the inventors discovered that using an

23   amino acid to accomplish this was more effective and more

24   efficient.

25           Now, in the original filing, the applicants set

forth a large number of embodiments.  These embodiments are
claimed in the patents in suit and later issued patents.

Now, some of those later patents have claims
addressing dipeptides.  But most of the claims of the
patents in suit are to the polypeptide -- I am sorry, most
of the patents in suit are to using the amino acid, not
using the residues as they would be found in the
polypeptide.

The patents in suit disclose three dipeptides:
carnosine, anserine, and balenine.

Plaintiffs say these dipeptides are not part of
the claim.  Defendants say they are.  That is one of the
basic issues for the Court to decide.

Now, the patents have seven terms.  We are going
to talk today about the group of terms beta-alanine,
L-histidine, and active derivative.

The first term, of course, is beta-alanine.  The
second is L-histidine.  Active derivative is closely related
but it's intertwined because the claim says, an amino acid
or active derivative selected from the group consisting of
beta-alanine, an ester of beta-alanine, an amide of
beta-alanine.  So the meaning of beta-alanine is going to
control what active derivative means in the claims at issue.

Beta-alanine is an amino acid.  And both the
patents in suit as well as the defendants' expert indicate

that two amino acids react to form a dipeptide.

Defendants' position is that the claims in the patent, where there is a reference to beta-alanine, it is a reference to the amino acid and the dipeptide, oligopeptide, or polypeptide.  This is confusing and it contradicts the intrinsic evidence.

Now, an important distinction that the Court has to address is the fact that the dipeptide has within it the covalently linked residues of two amino acids.  But it would be scientifically incorrect to say that the dipeptide includes the two amino acids.  Once the two amino acids enter into this covalent bonding, that bond is formed and the two individual amino acids no longer exist except as a residue.  Then you have the dipeptide.

It's much like an apple pie.  Once you take the apples, you cut them up, you put them into the crust and you bake them, you end up with an apple pie.  And the residue of apples is in that apple pie.  But the round apple, the actual apple, is no longer in that apple pie.

If you went to the grocer, and you said, I would like a bag of apples, and they brought you a bag of apple pies, you would think there was some kind of a mistake.

Similarly, in a dipeptide, the two amino acids no longer exist as amino acids but instead they exist as residues.  And you can see that in this particular slide,

here is what an amino acid is.  And it's got this hydroxyl.
Here is what the dipeptide is.  It no longer has the
hydroxyl.  It is, as I said before, the residue.

Now, beta-alanine and L-histidine are two
well-known amino acids, and the Court should construe them
together, as we have already said.  And because active
derivative is only used in the claims where the Markush
group of beta-alanine, amide of beta-alanine and ester of
beta-alanine, that Markush group and that active derivative
should be construed together.

The defendants have the belief that the term
beta-alanine should be beta-alanine, dipeptide, oligopeptide
or polypeptide.  We call that ADOP.  So when I refer to
ADOP, what I am trying to say is, all four of them together,
which is what the defendants are saying that the term
beta-alanine means.

Now, we find that there is strong evidence for
what the inventors meant and for what the examiner
understood in a petition to make special that was found in
the very first patent that was in this family.  In the
petition to make special, it's necessary that you not only
explain the prior art, but you explain why that prior art
does not stop the patentability of your claims.  That's what
is required by the Patent Office for a petition to make
special.

1          Now, the inventors made clear that when they

2     referred to beta-alanine or L-histidine in the claims, that

3     they meant the individual amino acids.

4          If I can show you, this is found at JA73, and it

5     is from the petition to make special in that the applicants,

6     the inventors said something very interesting.  They are

7     talking about the references --

8          THE COURT:  Could you blow that up a little bit,

9     counsel.

10          MR. CHAMBERS:  I will certainly try.

11          THE COURT:  These are backup glasses.  I lost my

12     originals.

13          MR. CHAMBERS:  How about that.  If I can get my

14     left and right proper, I will be fine.

15          They are talking about the prior art.  They are

16     talking about the Setra reference.  They say it describes

17     compositions containing the carnosine dipeptide that I

18     showed us just a minute ago, and it uses that composition

19     for treating muscle fatigue in athletic performance.  It

20     says carnosine is a dipeptide.  Of course, right there is

21     what the dipeptide would actually be called scientifically,

22     beta-alanyl L-histidine.

23          According to the Setra invention, they say that

24     dipeptides contain histidine, containing that ring structure

25     that is on the histidine ring, so that's on the histidine

that I showed you, can be used for these benefits.  And
then, on the very next page, they say, "In contrast to the
present invention, the compositions and methods described in
Setra's invention teach dipeptides."

Well, that, we believe, means that the present
invention does not include dipeptides.  I don't see any
other way you could read that.

Now, it goes on to say -- so we have got a
disclaimer at Part 1, where they say, In contrast to the
present invention.  Now in the next sentence, it says, "In
the present invention," then it uses those terms that we are
going to be fighting over, beta-alanine and L-histidine,
"are administered to regulate hydronium ions."  And then it
says, Setra does not teach or suggest or mention using
monopeptides for the treatment of hydronium ions.  We
believe that monopeptide is referring to the two
monopeptides that are set forth right above that.

That is a second time they disclaim the idea
that the term beta-alanine and L-histidine is really ADOP.

If you look at the bottom, you find that Harris,
et al., also described the effect of using dipeptides.  Then
they define what the dipeptides are, carnosine and anserine
on the hydronium ion concentrations in muscle.

Then it distinguishes Harris from their
invention by saying, Harris neither teaches nor suggests the

use of beta-alanine or L-histidine, i.e., that is,
monopeptides in the regulation. They are showing that in
their invention we are using the monopeptides. In Harris,
they were using the dipeptides.

So the first statement, where it says Harris
described the effect of dipeptides on hydronium ion
concentrations in muscle, they are distinguishing it yet a
third time, disclaiming that theirs the same thing. And
then in the fourth position, when they say i.e.,
monopeptides, they are saying, we are defining alanine and
histidine as monopeptides.

You also find on that same page, when they are
talking about the histidine reference, they are talking once
again, in histidine, of using beta-alanine and carnosine.
Carnosine is a dipeptide. So they are saying, we see a
difference between beta-alanine and the dipeptide side. And
then they are saying that the present invention teaches that
the administration of beta-alanine, either alone or in
combination with other factors, is useful in reducing
hydronium ion concentration.

That is even an additional time.

What we find is that at least four times in that
particular passage they have said that beta-alanine and
L-histidine are the monopeptides, not the dipeptides. That
petition goes on and says none of the references either

alone or in combination teach or suggest a method of
regulating hydronium ion concentrations by administering
beta-alanine to a human tissue.

Your Honor, if beta-alanine really meant
dipeptides, it's clear that the Setra reference, which is
dealing with looking at dipeptides, would have invalidated
any possible claims.  So we don't believe that it is meant
to include those dipeptides.

Once again, Your Honor, that means four times in
four separate places on JA74 the applicants disclaimed the
definition that defendants are now proposing.  Setra,
Harris, saying the beta-alanine an L-histidine are
monopeptides in contrast to Setra, et cetera, and in the NS
or i.e. for Harris.

Most importantly, the Court has to consider how
the claims of the patent could issue covering dipeptides
with Setra and Harris there.  The prior art would explicitly
and inherently anticipate the invention.  So it is not clear
how the examiner could have been construing the claims in
the way that defendants now claim.

If you look at JX-9, Exhibit 9, at JA96 through
97, that is the Setra patent application.  And that Setra
patent application shows a couple things.  It shows that
they are using the dipeptides and it shows in the claim,
Claim 5 of Setra, that they are using it for muscle fatigue,

1    which is exactly what the patents in suit are dealing with.

2            Table 4 in the patents in suit, which is found

3    in Exhibit 3, Column 11, separately considers beta-alanine

4    and the dipeptide, indicating that beta-alanine for the

5    inventors was something different than the dipeptide.  You

6    can see in the bottom, where they are talking about

7    beta-alanine, beta-alanine, beta-alanine, beta-alanine.  And

8    then over here they talk about carnosine, indicating that

9    they saw beta-alanine as something different than the

10   dipeptide carnosine.

11           Now, in describing the different embodiments of

12   the invention, the specification says that beta-alanine can

13   be provided as an amino acid or as a component of

14   dipeptides, oligopeptides or polypeptides.  It doesn't say

15   that beta-alanine is.  But it is a component.  And it

16   indicates that the amino acids are something very different

17   than the dipeptides.

18           This is also true for the claims.

19           Considering Claims 1 through 4 of the '098

20   patent, which is at Exhibit 2 of the joint appendix at 43,

21   here the applicants specifically call for a peptide source,

22   including beta-alanine.  Now, if beta-alanine means ADOP,

23   then it really makes no sense, because then the claim is

24   saying, a peptide source of polypeptides.  That is not the

25   way scientists normally speak.

1          When the applicants call for beta-alanine, they

2    mean the amino acid in these claims, and unless they clearly

3    say something else, such as a peptide source, it should be

4    construed as the amino acid.

5          The specification also underscores the need to

6    supply beta-alanine as an amino acid and not as a component

7    of the dipeptide.  We will talk about that a little later in

8    the construction.  And the examples disclosed in the

9    specification show the preferred embodiments were the

10   individual amino acids.

11         Now, active derivative is part of a larger

12   element of the claim, which is, a composition comprising an

13   amino acid or an active derivative thereof selected from the

14   group consisting of beta-alanine, an ester of beta-alanine

15   and an amide of beta-alanine.  And you can see that on the

16   exhibits, Exhibit 3, looking at Claims 5, 17 and 33.

17         The Court only needs to define active derivative

18   in the context that it's used in the claim.  An active

19   derivative is defined in the patent as a compound derived

20   from or a precursor of the substance that performs in the

21   same or similar way in the body as the substance in the

22   body.

23         Examples include esters and amides.

24         You can find that particular reference there at

25   Column 2, Lines 46 through 50.  The patent indicates -- I am

sorry, Exhibit 3, one of the patents in suit, shows that in Column 2, Lines 31 through 34, and also Column 5, Lines 11 through 14, what a precursor is. It talks about beta-alanine and L-histidine being precursors to the dipeptide, not the other way around. Because a claim term can't be construed in isolation, that is why it is necessary to put these particular items together.

Basically, a precursor is something that comes before. If you think of the amino acids as building blocks for peptides and building blocks for proteins, then you can have the individual amino acids and they form the peptides. And they are precursors of the peptides. But you wouldn't normally say that the peptides are the precursors to the amino acid. And here is why.

Just like a brick, a brick is a precursor to a brick wall, you don't consider a brick wall as a precursor to a brick. You don't tear down a brick wall in order to make bricks. It's something entirely different.

Now, as I said before, defendants want this construction to have ADOP, amino acid dipeptide, oligopeptide and polypeptide, every time the word beta-alanine appears in the claims. The intrinsic record, however, shows what that term, an amino acid or active derivative from the group consisting of beta-alanine, an ester of beta-alanine, and an amide of beta-alanine, they

1    show what that means.

2              The term active derivative is an active

3    derivative of an amino acid and it's not an active

4    derivative of the oligopeptide or polypeptide or the

5    dipeptide.  An amino acid is not a dipeptide, which is by

6    definition two amino acid residues that are chemically

7    bonded with a peptide bond between them.

8              I have already spoken that beta-alanine and

9    L-histidine are precursors and it's not ADOP, as suggested

10   by defendants.  But in addition, the dipeptides of

11   beta-alanine and L-histidine don't even perform in the same

12   or similar way in the body as the individual amino acids.

13             And the patent sets forth that.  That is

14   important because active derivative, that is a key element

15   of that.  For example, the patents in suit say that the

16   dipeptides help in the buffering capacity of the muscles

17   during periods of sustained exercise, whereas the amino

18   acids do not.  That can be found at Exhibit 3, Column 2,

19   Lines 1 through 23, Column 4, Line 66, through Column 5,

20   Line 10.  Also, the dipeptides have to be synthesized inside

21   the muscle cell from the precursor amino acids, beta-alanine

22   and L-histidine.  That is at Column 5, Lines 11 through 29.

23   The dipeptides don't fit within the meaning of an active

24   derivative.  And that is set forth in the patents in suit as

25   well as the claims that you have.

1          Now, the term active derivative should be

2     construed to mean a compound derived from or a precursor of

3     the substance that performs in the same or similar way in

4     the body as the substance or which is processed into the

5     substance and placed into the body.

6          The term active derivative first appears in

7     newly added claims.  And the applicants set forth the

8     support for these claims.  Exhibit 5 at JA83 says that.

9     When you are filing something in the Patent Office, you

10    can't just file anything you want, any words you want.  You

11    have to say where the support for those terms are.  So we

12    can actually look for the support for those terms and see

13    what they meant.

14         To support these newly added claims, the

15    applicant pointed to Figures 3 through 6 and Example 1.  And

16    that is found, where they describe this, at Exhibit 5, JA83,

17    but it is also found in Exhibits 1 through 3 because you can

18    find Example 1 and you can also find Figures 3 to 6 where

19    they describe them.

20         A review of those figures in Example 1 show that

21    feeding studies that support the claim that you later find

22    are feeding studies of the amino acid beta-alanine, but not

23    feeding studies dealing with the dipeptide, the oligopeptide

24    or the polypeptide.

25         Now, if this term really meant ADOP, as

defendants would have us believe, then the applicants would

have needed to show support for feeding the dipeptide,

support for feeding the oligopeptides, and support for

feeding the polypeptides in order to get the effect that you

find in the claims.

In addition, the word beta-alanine, if the word

beta-alanine really meant ADOP, then where are those

beta-alanine esters and where are those beta-alanine amides

of the dipeptides?

They are not in the specification.  The

specification is silent on amides and esters that are

dipeptides.  Where are the beta-alanine esters and

beta-alanine amides of the oligopeptides, and where are the

beta-alanine esters and beta-alanine amides of the

polypeptides in the specification?  There are none.

Now, there is no place in the specification that

describes any polypeptide ester, a beta-alanine, or any

oligopeptide ester of beta-alanine or even any dipeptide

esters of beta-alanine.

There is a reason for that.

Remember that slide that we saw earlier.  This

is what the dipeptide looks like.  This is what the

beta-alanine looks like.  And this is what the ester looks

like.

You can see that the ester has an oxygen bond

here, whereas the dipeptide has a nitrogen bond.  You are

going to have to destroy the beta-alanine dipeptide in order

to have an ester.  You wouldn't have a dipeptide anymore.

So we don't believe that this term includes esters of the

dipeptides, esters of the oligopeptides, and esters of the

polypeptides, because there doesn't seem to be support in

the specification as filed.

        L-histidine is another amino acid that is

important in this invention.  For the same reasons described

previously for beta-alanine, we think it should be held to

be the same.  For that reason, we believe that the

constructions that we have provided, that we talked about

earlier, should be the constructions that the Court adopts.

        And it's my understanding that the way you

wanted to do this is that the defendants would now go

forward with their analysis, and then we will come back to

dietary supplement.

        THE COURT:  That is what the parties agreed

upon.  Right?  Term by term?

        MR. CHAMBERS:  Yes.

        THE COURT:  We grouped the first ones.

        MR. CHAMBERS:  Yes.  Thank you.

        MR. HANSEN:  May I approach, Your Honor, and

give you a copy?

        THE COURT:  Yes.

1          MR. HANSEN:  May I proceed?

2          THE COURT:  Yes.

3          MR. HANSEN:  Thank you, Your Honor.

4          As we said, I am going to present a brief

5     tutorial before Mr. DiGiovanni takes the lead argument on

6     the terms that we are addressing now.

7          This is the first slide.  What we want to do

8     here is accomplish two things for the Court.  Some of this

9     will look a little similar to what plaintiffs presented but

10    the emphasis is going to be different.  We want to

11    graphically show the structures of some of these compounds

12    to give the Court an idea of the similarities and

13    dissimilarities between the compounds in a visual way, since

14    that's not done if the patent.

15         The other thing we wanted to do was to discuss

16    the metabolic pathway by which these materials, be it the

17    dipeptide form of beta-alanine or the single amino acid form

18    of beta-alanine, are processed in the body, because one

19    issue that is going to be of particular importance in

20    construing these claims and understanding what a portion of

21    the specification is talking about is being sure that the

22    Court is aware of where we are in the metabolic process.

23         The reason I say that is because some of the

24    claim limitations speak to certain compounds at a certain

25    location, for example, in the blood or blood plasma, or in

the muscle tissue, or at the point of initial delivery. And
what the patent teaches about whether a single peptide or a
dipeptide is used depends largely on where we are in the
metabolic process. So we thought that might be helpful.

So here we are. These are two main single amino
acid forms of the key compounds in these claims,
beta-alanine and L-histidine, both of which are naturally
occurring amino acids.

By way of explanation, this term amino acid, we
thought we would explain what we are talking about when we
use that, since it's a large category, actually, of
compounds in nature. Amino acids are defined by an acid
group here, which has a carbon, doubly bonded to an oxygen,
and then a hydroxyl group, which is an oxygen bonded to a
hydrogen. That is the acid part of the amino acid.

If you look, you can see beta-alanine has one of
those and L-histidine on the right also has one of those.
The other defining feature of an amino acid is an amine
group. That is a nitrogen bonded to two hydrogens. You can
see that beta-alanine has one here and L-histidine has one
here.

So these are the defining features that make
these two compounds amino acids.

All right. So we are obviously going to hear a
little bit about carnosine today, and we already have.

1        Carnosine is a dipeptide.  You can see that the

2   structures of beta-alanine and L-histidine are preserved in

3   the dipeptide save for one location, that location is right

4   here.  When these two molecules bond, the hydroxyl group

5   that was present here is lost and this carbon bonds to the

6   amine group here.  And what happens is you give off a water

7   molecule.

8        But you can see that the identities of these

9   molecules are preserved.  So this molecule can then be

10   reverse-broken-down to provide the single amino acid.

11        Also, one thing to be mindful of, you will see

12   in the patents there is a tendency to jump between common

13   names and the formal chemical names.  So carnosine will

14   sometimes be referred to as beta-alanyl L-histidine.

15        In the patents, the goal is to produce more of

16   this beta-alanyl L-histidine in the muscle tissue.  That is

17   the ultimate goal that produces this hydronium ion

18   regulation effect.

19        The patents also speak of other dipeptide forms

20   of beta-alanine.  One of them is called anserine, that is

21   here.  The formal name is beta-alanyl L-1-methylhistidine.

22   We can see again that the structure of beta-alanine is

23   preserved, save for this peptide bond, one location.  And

24   the histidine structure is present here as well, except

25   there is this little extra group here, a carbon and three

hydrogens, that is called a methyl group.  Sometimes you will hear anserine referred to as including a methylated analog of histidine, and that refers simple to the fact that there is this methyl group sticking out on the histidine molecule.

Similarly, we have balenine down here.  Again, here is the beta-alanine component, just a single peptide bond between the two molecules.  Again, this is a methylated analog of histidine, so it has this CH-3 group, carbon and three hydrogens sticking out.

Also, one thing to note here is that even after the dipeptide is formed, it still retains the essential features of an amino acid.  So if we look at anserine, here is an amine group, here is the acid group.  If we look at balenine, here is the acid group, here is the amine group.

What does that mean?  That means these molecules can continue linking to other amino acids and that's how you get an oligopeptide or a polypeptide, by that continual linkage.  When you hear about proteins, proteins are very long chains of these types of amino acids.

With this background in mind, let's talk a little bit about the metabolic pathway.  We thought it might be helpful to have a little illustration of it.

In this example, we are just talking about ingestion.  But the patent goes into other methods of

1    delivery.

2              A person, it is taught in the patents, can

3    ingest beta-alanine in its single amino acid form or in its

4    dipeptide form.  I realize the parties are arguing about

5    what beta-alanine means.  At this level of teaching it is in

6    the patent and it was in the Setra patent that plaintiffs'

7    counsel discussed.

8              Okay.  If carnosine is ingested, what happens is

9    in the digestive tract it is broken down into the

10   constituent amino acids.  Here is the beta-alanine, two of

11   the constituents single have to form, here is the

12   beta-alanine and here is the L-histidine.  That is what

13   happens in the blood.  There is actually, in one of the

14   examples, Example 2 in the patents, where they actually used

15   carnosine, when they tested the blood, the carnosine was

16   gone in the blood.  What was left was just a single amino

17   acid form.  So there is a conversion process that takes

18   place when you ingest carnosine.  But at the blood, it is a

19   single amino acid form.

20             The next part of the metabolic pathway that is

21   taught in the patents is to, in the muscle tissue, then,

22   synthesize carnosine by recombining the beta-alanine and the

23   L-histidine.

24             So again, as this is intended to illustrate, we

25   have really three key locations to consider when we are

1    talking about what chemicals are at issue in the metabolic

2    pathway.  Are we at the point of ingestion?  Are we in the

3    blood or blood plasma?  Or are we in the muscle tissue?

4             It helps to have an illustration like this to

5    try to keep those issues straight.

6             Unless the Court has any questions about this, I

7    will defer to Mr. DiGiovanni for the argument.

8             THE COURT:  Thank you, counsel.

9             MR. DiGIOVANNI:  Your Honor, may I approach the

10   easel?

11            THE COURT:  Sure.

12            MR. DiGIOVANNI:  Thank you.

13            Can Your Honor read this?

14            THE COURT:  Yes, I can.

15            MR. DiGIOVANNI:  Okay.  Terrific.  Thank you,

16   Your Honor.

17            So the first terms we are going to address are

18   beta-alanine and L-histidine, and immediately after that I

19   will address active derivative.

20            So with regard to beta-alanine and L-histidine,

21   these are terms that were expressly defined by the inventors

22   in the patents.  And what we did not see was the definition

23   that was attributed to these terms by the inventors in the

24   earlier presentation.  But I am going to certainly address

25   that.

1          What I have done is, on the easel, I have the

2     two parties', the plaintiffs' and defendants' constructions

3     that we will be referring to.  And plaintiffs' construction

4     is on the right-hand side, and defendants' construction is a

5     little bit different than how it was characterized earlier.

6          What defendants are arguing, and based on the

7     inventors' definitions, is that beta-alanine means

8     beta-alanine in the form of the individual amino acid or as

9     a component of the dipeptide, such as carnosine or an

10    oligopeptide or a polypeptide or an active derivative

11    thereof.

12         The L-histidine definition is very similar, just

13    as the inventors set forth.  That is, L-histidine means

14    L-histidine in the form of the individual amino acid by

15    itself, or as a component of a dipeptide, or an oligopeptide

16    or a polypeptide.

17         So what I think we heard in the earlier

18    presentation from plaintiffs is that defendants contend that

19    beta-alanine means the entire dipeptide.  That is not what

20    is being contended.  Beta-alanine means the beta-alanine,

21    either in the individual form or as a component of the

22    dipeptide, as we saw in the technology tutorial.

23         So, Your Honor, these slides, I am going to skip

24    a few that would be redundant after the plaintiffs'

25    presentation.  Just as a little bit of background.

Representative Claims 32 and 33 just show how beta-alanine
and L-histidine are used in the claims.  32 says a human
dietary supplement comprising beta-alanine and L-histidine.

So the issue to be addressed here is, well, what
did the applicants mean when they said beta-alanine?  And
what did they mean when they said L-histidine?

This next slide, Your Honor, is a direct quote
in the box there from the '361 patent.  The three patents in
suit have the same specification, so it's in all the patents
in suit.

What the inventors said in their application,
and I will read the highlighted portion, they say, Each of
the beta-alanine or L-histidine can be the individual amino
acids or components of dipeptides, oligopeptides or
polypeptides.

That is, Your Honor, directly quoted in
defendants' construction.

The plaintiffs, on the other hand, are seeking
to contravene that construction.  In fact, seeking to
directly contravene the inventors' definitions by, in fact,
striking out or removing something the inventors expressly
said.  The inventors expressly said that L-histidine and
beta-alanine can be components of dipeptides.  And what we
are seeing is plaintiffs are seeking to avoid that, even
though it was a direct statement by the inventors.

1          So what's important about this slide and the

2     definition is, of course, the inventors are acting as their

3     own lexicographers, as they are allowed to do.  And, in

4     fact, under Phillips, as Your Honor knows, the Federal

5     Circuit says that the inventors' lexicography governs.

6          Now, below that quotation is just a couple of

7     bullet points summarizing sort of the importance of the

8     definition of the inventors.  Number one, it refers to

9     beta-alanine and L-histidine in either the individual amino

10    acid form or as components of dipeptides, oligopeptides or

11    polypeptides.  And number two, as highlighted in green in

12    that definition, the beta-alanine or L-histidine can be

13    active derivatives.

14         So if you take the highlighted portion in both

15    yellow and green, that is exactly defendants' claim

16    construction proposal in this case.  It is directly from the

17    patent.  So the fact that there is a definition was admitted

18    by plaintiffs.  They conceded that in their opening brief.

19    The plaintiffs state, this is a quote from their opening

20    brief, they talk about what the inventors were stating, and

21    they say, as they did in their argument, they immediately

22    went to the prosecution history to say that it modifies the

23    definition of beta-alanine and L-histidine in the

24    specification.

25         So there appears to be no dispute, there was no

dispute, Your Honor, in the opening brief that, in fact, there was a definition set forth.  I believe in the answering brief they tried to step back from that a bit and say there were multiple definitions in the patent specification.  They mentioned that actually in their opening brief and again in their answering brief.  But taking a look at the inventors' definitions, there are no multiple definitions set forth in there.  There is a single definition of beta-alanine and L-histidine, and that's what defendants have adopted as their proposed constructions in this case.

Moving away from the express definition of the inventors and looking at the remainder of the patent specification, which again is the same in all three patents, the background of the invention section is quoted in this slide.  And here, the inventors state, Dipeptides of beta-alanine and L-histidine and their methylated analogs include carnosine, anserine, balenine.  Here the inventors are expressing their view that is consistent with their definition that, in fact, beta-alanine is part of a dipeptide and is part of carnosine.

They are not saying that carnosine includes some sort of residue that you would consider not beta-alanine. Here they are calling it beta-alanine.  They are using the term beta-alanine to mean a portion of the dipeptide.

1            Here is a similar statement made by the

2    inventors in the context of Example 2 in the patents, where

3    the phrase beta-alanine is used by the inventors, in the

4    parentheses, they say, "(e.g., in the form of anserine and

5    carnosine.)

6            Once again, the inventors are expressing their

7    clear view that was set forth in their definition that, in

8    fact, beta-alanine can exist in the form of a component of

9    carnosine.  In other words, beta-alanine is not limited

10   solely to the individual amino acid, because when you have

11   carnosine you have a beta-alanine component of that

12   molecule.

13           Once again, here is Table 4, summarizing some

14   experiments, an absorption study that was performed by the

15   inventors.  They used as some of their test material not

16   only beta-alanine, the individual amino acid, but they also

17   used carnosine and they also used a chicken broth.  And for

18   both carnosine and chicken broth, the inventors referenced

19   that as having beta-alanine.

20           That was the specification, Your Honor.

21           I am going to move to the claims, in fact, most

22   specifically, the claims of the '361 patent, to see how the

23   inventors used the term beta-alanine and L-histidine.

24           Now, what's quoted here are Claims 1 and 3 of

25   the '361 patent.

1          Here we have Claim 1, which is a fairly general

2     claim, stating, claiming a composition comprising a mixture

3     of creatine and a composition comprising an amino acid or

4     active derivative thereof selected from the group consisting

5     of beta-alanine, an ester of beta-alanine, and an amide of

6     beta-alanine.

7          Now, Claim 3 is critical.  In Claim 3, a

8     dependent claim, the inventors claimed a composition of

9     Claim 1 wherein the beta-alanine further comprises a

10    dipeptide, an oligopeptide or a polypeptide.

11         So in Claim 3, Your Honor, of the '361 patent,

12    there is an express use of the term beta-alanine that must

13    include beta-alanine as a component of a dipeptide or a

14    polypeptide or an oligopeptide.

15         The definition proposed by plaintiffs just

16    doesn't fit in this claim.  It would not work.  I have a

17    couple of slides that follow that explain.

18         This next series of slides explains the dilemma

19    that is posed to plaintiffs due to Claim 3, and perhaps

20    that's why we haven't heard anything about Claim 3 yet, Your

21    Honor.  What we see in Claim 3 is the use of beta-alanine --

22    let me just back up.

23         In Claim 1, beta-alanine has its definition as

24    expressed by the inventors.  So that means it can be either

25    the individual amino acid or a component of a dipeptide.

Then Claim 3 narrows Claim 1 and expresses that their beta-alanine further comprises a dipeptide, an oligopeptide or a polypeptide. And this Claim 3 only makes sense if the inventors' definition of beta-alanine is adopted, which is the same definition that is being offered by defendants.

Plaintiffs' doesn't work.

So in the bottom left here, under defendants' construction of beta-alanine, Claim 1 means that beta-alanine can exist in the individual form or as a component of a dipeptide. And Claim 3 narrows the claim and specifies that the beta-alanine of that claim exists as a component of the dipeptide, or the oligopeptide or the polypeptide.

Let me go over to the bottom right, using plaintiffs' construction. So if you adopt plaintiffs' construction, Claim 1, or any time you use beta-alanine precludes the beta-alanine from existing in the form of a component of the dipeptide. Now you go to Claim 3 under plaintiffs' construction, there is no way to reconcile Claim 3 under plaintiffs' claim construction, because their construction mandates that the beta-alanine exists by itself as an individual amino acid.

So you can't have a situation where the beta-alanine further comprises a dipeptide, oligopeptide or

1   polypeptide.

2            So, again, on this Claim 3 dilemma of

3   plaintiffs, if you adopt their claim construction -- and

4   this is an exercise where I placed in their construction in

5   brackets in Claim 3, where the term beta-alanine existed --

6   it's the composition of Claim 1 wherein the individual amino

7   acid, beta-alanine, or its salt, ester, or amide, further

8   comprises a dipeptide, an oligopeptide or a polypeptide.

9            It's a complete impossible and nonsensical

10  claim, because if the beta-alanine further comprises the

11  dipeptide, it would no longer be an individual amino acid,

12  and therefore it would no longer be beta-alanine.  It

13  collapses upon itself, Your Honor.  It can't be read using

14  their construction.

15           So Claim 3 is irreconcilably inconsistent with

16  their construction.

17           Then the final slide on this summarizes that

18  there are essentially three problems that plaintiffs

19  encounter due to Claim 3 and due to their construction that

20  is different than the inventors' definition.  That is,

21  number one, the construction is directly inconsistent with

22  Claim 3's requirement that the beta-alanine exists as a

23  component of dipeptide.  No. 2, Claim 3 -- by the way, Claim

24  3 isn't the only claim that adopts that language.  There is

25  also Claims 12 and 24 that also require that the

beta-alanine further comprises a dipeptide, an oligopeptide
or polypeptide.

Point 2 is Claim 3, 12 and 24 are rendered
nonsensical, contrary to Federal Circuit law.

And also, Claim 3, which is a dependent claim on
Claim 1, under defendants', under our construction, it
narrows Claim 1.  Under plaintiffs' construction, it does
not narrow -- if it can be read to make any sense, which I
don't think it can, it certainly would not narrow Claim 1.

One additional point is, Claim 3 of the '361
patent, and Claims 12 and 24, they were added during the
prosecution of the '361 patent.  The petition to make
special in the prosecution history we heard quite a bit
about.  That was in the prosecution of the '596 patent,
which was an earlier patent.  The '361 patent application
was filed later.  And during the '361 patent application,
the inventors proposed to the Patent Office these new
claims, Claim 3 that I just talked about quite a bit, and
Claims 12 and 24.  When they did that, as Mr. Chambers said,
typically, support is described for those new claims.  And
what the inventors did in this case, when they adopted this
new Claim 3, 12 and 24, when they proposed it to the Patent
Office, they said, support for these new claims directed to
a composition where beta-alanine further comprises a
dipeptide, an oligopeptide or a polypeptide can be found,

1      inter alia, on Page 3, Line 28 to Page 4, Line 2.

2              That passage, that is the inventors' definition

3      in the original patent application and in the patent as

4      issued of beta-alanine and L-histidine, which is the

5      proposed construction that defendants are making.

6              Even after this petition to make special in the

7      prosecution history, the inventors proposed this Claim 3 and

8      re-incorporated this definition of beta-alanine, that would

9      allow beta-alanine to exist as either the individual amino

10     acid or as the component of a dipeptide or a polypeptide or

11     an oligopeptide.

12             THE COURT:  Mr. DiGiovanni, are we, with these

13     claim terms, are we in that portion of the parties'

14     arguments over disclaimer and/or lexicography?  Two

15     different concepts.  I think the defendants assert they

16     acted as their own lexicographers, which they are entitled

17     to do, and this is how they define the term, you offer this

18     as further support for that.

19             Genentech is cited by both parties, one as being

20     apposite and the other, you, being inapposite.  So is it the

21     defendants' position that this Court should say, you acted

22     as your own lexicographer and you are stuck with the

23     definitions that you gave to the PTO?  Or am I misperceiving

24     the argument?

25             MR. DiGIOVANNI:  No, Your Honor.  We are saying

1    that the inventors proposed a definition and that definition

2    should govern.

3            I will address in just a moment the petition to

4    make special in the prosecution history.  What our position

5    is, we recognize the prosecution history.  We understand

6    that they made some statements.  However, it was not clear,

7    it was not unmistakable.  And the prosecution history as a

8    whole does not overcome the definition in the patent and

9    especially since, in these particular patents, patent claims

10   of the '361 application that we just looked at, they

11   referred back to that original definition, after this

12   prosecution history.

13           That is all part of the prosecution history.

14           THE COURT:  So, then, you would say that this

15   portion of Genentech, that I should apply it as you suggest,

16   I am quoting from the case, where the Federal Circuit wrote,

17   I guess this is at, probably at Page 1564, I think.

18   Headnote -- I have the West version, Headnote 6, I think it

19   is, in discussing the prosecution history, the Court wrote,

20   "An appropriate method for resolving the issue is to avoid

21   those definitions upon which the PTO could not reasonably

22   have relied when it issued the patent."

23           That's the tool that I am told to utilize, is it

24   not, when issues of this type arise?  Do I need to get into

25   that?  Go ahead.

1          MR. DiGIOVANNI:  I would say, Your Honor, that,

2     Genentech may apply.

3          THE COURT:  I am not sure.

4          MR. DiGIOVANNI:  I am saying, in a situation

5     where there is a definition that makes no sense in the

6     context of the patent claims, perhaps Genentech would apply.

7     Here, it's actually the opposite.  It's the definition

8     that's being proposed by plaintiffs that can't be reconciled

9     with the patent claims that must be rejected.

10         So this is a brief timeline.  I am not going to

11    go through this.  This just indicates, Your Honor, in the

12    bottom left, the petition to make special was filed in March

13    of 1999.  The '361 patent was filed in early -- January 9th,

14    2001, so when they reincorporated that definition, after

15    this petition to make special, it was a year and a half to

16    two years after that.

17         So the petition to make special, Your Honor

18    anticipated I was going to address this next, the petition

19    to make special that was filed in the '596 prosecution

20    history is not a disclaimer of the scope of the term

21    beta-alanine or L-histidine, for three reasons that I will

22    detail in the following slides.

23         Number one, it is not a clear and unmistakable

24    disavowal, which is what is required, as Your Honor knows.

25         No. 2, the prosecution history as a whole

indicates that it is not a disclaimer.  The Federal Circuit

instructs that one is not to look at specific items in the

prosecution history without looking at the entirety.

And No. 3, the prosecution history of later

applications indicates very clearly that the applicants did

not disclaim beta-alanine as components of dipeptides or

polypeptides.

So number one, the petition to make special is

not a disclaimer.

A portion of the petition to make special that

was not referenced in Mr. Chambers's presentation appears at

Page 3 in joint appendix Exhibit 4.  There the applicants

state that the methods of the present invention include

providing the dipeptides, peptides, or peptide analogs by

any number of means, including, for example, ingestion or

injection.

So this is an indication that, in fact, the

applicants did not disclaim, as is claimed by plaintiffs,

dipeptides in the invention to beta-alanine as components of

the dipeptides.

The portion of the petition to make special that

was cited by plaintiffs in their presentation is not a clear

and unmistakable disavowal.  In it the applicants described

the Setra prior art reference, and, Your Honor, at most, the

applicants stated that Setra did not recognize the role of

1  beta-alanine or L-histidine either in the individual form or

2  the form components of the dipeptides.

3           So the focus, in other words, that the

4  applicants were pointing their finger at Setra and saying,

5  well, they didn't focus on the individual amino acids either

6  by themselves or as part of the dipeptides.  Setra instead

7  just focused on the entire dipeptide.

8           So the statements that are made, then, in the

9  petition to make special, especially considering the fact

10 that there was an express definition in the patent

11 application of beta-alanine and L-histidine, that clearly

12 and expressly allowed beta-alanine to exist in the form of a

13 component of dipeptide, the statements that are made in the

14 petition to make special don't rise to the level of being a

15 clear and unmistakable disavowal of claim scope.

16           The next slide just is a cite to a case.  I will

17 move on from that.  I will move on, Your Honor.  I am sorry.

18           The 3M case says that when the patentee has

19 expressly defined a term in the specification, that the

20 definition would control over broad remarks during

21 prosecution.

22           So this next slide makes the statement or

23 follows up on my earlier bullet point that the prosecution

24 history as a whole indicates there is no disclaimer.

25           So what do we look at when we look at the

prosecution history as a whole?  Sure, we do look at the

petition to make special.  We need to look at the entirety

of it, including the earlier portion of it that I cited,

which makes express reference to dipeptides.  But you also

have to look at the '361 prosecution history, where the

applicants claimed the beta-alanine as part of the dipeptide

in Claims 3, 12 and 24, and then as I stated earlier, when

they did that they reincorporated that general definition,

even after the petition to make special.

       Now, the prosecution of later patent

applications also shows no disclaimer.  The broad statement

that was made by plaintiffs in their --

       MR. CHAMBERS:  Your Honor, are we going to go

into extrinsic evidence at this point?  It appears that we

are.

       MR. DiGIOVANNI:  Your Honor, whether subsequent

patent applications are extrinsic or intrinsic, I don't

believe there has been a definitive ruling on whether they

are or not.  I can't conclusively say this is extrinsic

evidence, Your Honor.  This is the subsequent prosecution

history.

       THE COURT:  I think the point made earlier by

Mr. Chambers was his view is unless it's from the same

family --

       MR. CHAMBERS:  That is correct.

1    THE COURT:  -- it would be appropriately viewed

2  to be extrinsic.  Why would you disagree with that?

3    MR. DiGIOVANNI:  This is the same family.

4    THE COURT:  This is from the same family.

5    MR. DiGIOVANNI:  So what we have here is the

6  '084 patent, which is a continuation-in-part application

7  from the same patent family.  The broad statement made by

8  plaintiffs is that based on this statement in the petition

9  to make special that the applicants disclaimed dipeptides.

10  And they say that throughout their briefs.

11    In fact, they said it earlier today.

12    When they filed this continuation-in-part

13  application in the '084 patent, they once again used that

14  definition.  In fact, they actually beefed it up a bit to

15  make it more clear that in fact beta-alanine can exist as a

16  component of carnosine.  They added the parenthetical (e.g.,

17  carnosine, anserine and balenine) four lines into that

18  definition.

19    So same patent family, they once again made

20  clear that beta-alanine can be included or can exist as a

21  component of a dipeptide or a polypeptide or an

22  oligopeptide.

23    Here are the claims of that very same '084

24  patent in the same patent family.  What is claimed?  Number

25  9:  A dietary supplement comprising a mixture of creatine

1    and anserine or balenine.  Well, anserine and balenine are

2    dipeptides.  So they haven't disclaimed dipeptides.  To take

3    the petition to make special to mean that they disclaimed

4    dipeptides, that can't be the case because neither the

5    examiner, same examiner, nor the applicants, same

6    applicants, treated it as a disclaimer.  And that's evident

7    in the prosecution history.

8                 This is the final of the related subsequent

9    patent applications.  This is the '294 patent that issued,

10   filed in 2002, issued in 2004.  This is an actual

11   continuation, a straight continuation.  So it has the same

12   specification, including that same definition that I have

13   cited to a number of times.

14                 What is claimed in this patent?  It is a method

15   of increasing the anaerobic working capacity of a tissue in

16   a subject, similar language that we see in the patents in

17   suit, comprising the following steps.  Well, providing a

18   methylated analog of an amino acid selected from a group

19   consisting of carnosine, anserine and balenine.

20                 Again, there was no disclaimer of dipeptides.

21   The applicants didn't disclaim it.  In fact, they went ahead

22   and claimed it like gangbusters afterwards, and the examiner

23   allowed it.

24                 So the examiner didn't understand there was a

25   disclaimer, and the applicants didn't even treat it as a

disclaimer.

Your Honor, telling is this slide.  It is one of
the transition slides here.  Plaintiffs essentially admit
that there is no disclaimer.  In their opening brief, they
make a very general, very broad statement that the
statements by the applicants during the prosecution was a
clear and unmistakable disavowal that the applicants'
invention encompassed dipeptides such as carnosine that were
disclosed and claimed in the Setra reference.

They are trying to say there was a disavowal, no
claim of dipeptides.  Here is what they say in their
answering brief down at the bottom.  They say, The
prosecution history evidences a clear disavowal that any
term in the patents in suit encompass dipeptides, such as
carnosine or anserine, unless the claim explicitly states
dipeptide, anserine, or the like.

Recognizing this dilemma that appears due to
Claim 3, and recognizing the strength of the definition and
the fact that it was reincorporated and the fact that the
subsequent prosecution history that we put in our opening
brief, they try to have it both ways here, Your Honor.

They say there was a disavowal.  Well, unless we
say there wasn't, you can't do that.  Either there was a
disavowal or there wasn't.  Very clearly -- I won't say very
clearly.  We believe it is very clear that there was no

1   disavowal.

2               THE COURT:  Somebody taught you Appellate

3   Advocacy well when they say don't say "very clearly."

4               MR. DiGIOVANNI:  Yes.

5               So I do have some slides on extrinsic evidence.

6               THE COURT:  We can skip by these.  I was looking

7   at them.

8               MR. DiGIOVANNI:  It was only meant to be

9   definitional.  I will skip them.  We cited them in their

10  briefs.

11              THE COURT:  We are going to active derivative.

12  Right?

13              MR. DiGIOVANNI:  I have one additional point on

14  beta-alanine and L-histidine.  And that is an argument that

15  was made in the brief, in the opening brief and I think the

16  answering brief for plaintiffs.

17              They make their arguments and then they fall

18  back on the argument, well, the Court needs to construe the

19  claim to preserve the validity.  We think that maxim, which

20  does have some application but very limited, as Your Honor

21  knows, due to Phillips and other cases, we think it doesn't.

22  In fact, their argument to apply that maxim is faulty, it

23  has four faulty premises.  I will go through them, Your

24  Honor.

25              Number one, that maxim is only applied when the

1     claim term is ambiguous.  And even then it is still limited

2     even in that context.  Your Honor, we would propose or

3     suggest that the claim term is not ambiguous.  It is

4     expressly defined in there.

5           To the extent that there is some ambiguity in

6     the prosecution history statements, that doesn't go to the

7     ambiguity of the claims.  That goes to whether those

8     statements act as a disclaimer.  And that needs to be clear

9     and unmistakable.

10          So you have ambiguous statements at best.  Is

11     that a clear and unmistakable disclaimer?  No.  Then you go

12     to the patent definition, which is very clear.  So you never

13     get to the ambiguity that would be required for this maxim.

14          Number two, there are some lesser known Federal

15     Circuit cases.  I hesitate to say that --

16          THE COURT:  No, it's okay.

17          MR. DiGIOVANNI:  -- that say this maxim is also

18     never applied.  You can't apply it if the alternative

19     proposed construction is not practicable.

20          So these cases, Generation Two and Rhine, say,

21     the Rhine case says, "The Court has consistently limited the

22     axiom to cases where the construction is practicable."

23          So you need to take a look at the proposed

24     construction and say, well, does it work just as a threshold

25     matter?  As we say in Claim 3, their construction doesn't

work.  It makes an unpracticable claim, Claim 3.  So you can't apply this maxim.

No. 3, I guess it's a basic principle of the argument that when someone says please construe the claim to preserve the validity as well as the construction ought to actually preserve the validity.  In this case it does not, at least Claims 3, 12 and 24.  Those are the only claims we identified based on their construction that would be just flat-out nonsensical and inoperative.

But I think we can also say that we probably have an enablement problem and an indefiniteness problem if we adopt their construction, which is internally inconsistent with Claims 3, 12 and 24 of the '361 patent.

And the fourth of the four faulty premises of their argument that the Court ought to construe the claim to preserve the validity is that the examiner -- they make this argument I think it's at Page 20 of their opening brief, they argue that the examiner recognized that dipeptides were disclaimed by the applicants.  I just want to summarize that in fact the examiner did not.  He allowed Claims 3, 12 and 24, which he would not have allowed if he recognized that in fact dipeptides were disclaimed.  The applicant in the Patent Office allowed carnosine claims in the '294 patent, which is a subsequent patent in the family, and he allowed anserine and balenine claims, also dipeptides claims, in the

1  '084 patent.

2          So the argument made by plaintiffs that the

3  examiner recognized that dipeptides were disclaimed is just

4  faulty.

5          Your Honor, my next slides deal with active

6  derivative.  So I am going to switch gears just a little bit

7  here.

8          THE COURT:  Okay.

9          MR. DiGIOVANNI:  I have separate slides for

10  active derivative, Your Honor.  But I will keep my

11  definition up on the easel.

12          THE COURT:  I have it in front of me as well.

13          MR. DiGIOVANNI:  That is fine.  I don't have an

14  easel definition of active derivative.  So that's great.

15  Terrific.

16          So just taking a look at the parties' dueling

17  proposals, they are identical up to a point.  So both

18  parties agree that the first part of the definition should

19  apply.  That is, compounds derived from or a precursor of

20  the substance that performs in the same or similar way in

21  the body as the substance or which is processed into the

22  substance and placed into the body.

23          The difference between the two, and I

24  highlighted it in red in this slide, in the right side,

25  plaintiffs add a kicker at the end.  They say, okay, they

1    ask the Court to add something at the end of that definition

2    that excludes dipeptides, oligopeptides and polypeptides.

3           So I am going to skip this, Your Honor.  I think

4    that was covered.

5           Where are both parties getting their definition

6    from?  Well, they are both getting it from the definition

7    that the applicants, the inventors, set forth in their

8    patent.  Defendants' proposed construction is verbatim, word

9    for word, the definition that was set forth by the

10   inventors.  It's a clear, unambiguous definition.  So it's a

11   specific definition that is adopted verbatim by the

12   defendants.

13          Now the case law says the patentee's definition

14   controls.  So where do the plaintiffs get this kicker from?

15   I call it a validity kicker because their argument for it at

16   their opening brief at 16 essentially is stating, okay,

17   there is a definition, they acknowledge there is a

18   definition in the patent, but they say -- and it's the

19   lowest of these four yellow highlights -- but they say,

20   well, certain things do not fit within the meaning of the

21   active derivative that is set forth in the patent in suit.

22   Therefore, they want to include that in the definition.

23          Well, Your Honor, I would say that that is not

24   the role of claim construction.  The claim construction is

25   to determine the -- this is from their brief, this is their

1    own words -- claim construction is, of course, to determine

2    the meaning of active derivative.  Whether something fits

3    within the meaning of it, that's not claim construction.

4    That is something that needs to be determined by the

5    fact-finder, either at summary judgment or trial or

6    otherwise.

7         But that is not claim construction.  Claim

8    construction is figuring out the meaning of a term.

9         That is what defendants have done.  The meaning

10    is expressly stated by the inventors.

11         Another important point here, Your Honor, is

12    that the term -- this is what I was alluding to earlier when

13    I advocated for the active derivative to be addressed

14    separately.  That is, the term active derivative never

15    appeared in the claims until the '361 patent.  And Mr.

16    Chambers acknowledged that.

17         That is why we didn't want to get that tied up

18    with this prosecution argument that was made in the earlier

19    patent, because the claim term active derivative never

20    appeared in the claims until the '361 patent.  And the

21    Federal Circuit case law says the doctrine of disclaimer

22    doesn't apply when the claim term in the descendant patent

23    uses different language.

24         I just wanted to make that emphasis.

25         Your Honor, with that, that's what I have on

those terms.

THE COURT:  Thank you, Mr. DiGiovanni.

MR. HANSEN:  Your Honor, may I supplement a couple points on behalf of DNP?

THE COURT:  Yes.  Mr. Hansen.

MR. HANSEN:  Thank you, Your Honor.

I want to address a couple of points from the plaintiffs' presentation specifically.

One point that was made a couple of times is that, well, once you have the dipeptide you no longer have the amino acid.  What you have are amino acid residues, and those aren't the same things as the amino acids.  And that is actually scientific incorrect, is what I believe they said, to call the components of the dipeptide amino acids because they are in fact residues.

That may be all well and good.  But the truth is it's the inventors who said that.  If it is scientifically incorrect, it's based on what the inventors said.

Here on Slide 42 we have the portion of the specification, not the highlighted portion, but above it, it says, "Each of the beta-alanine or L-histidine can be components of dipeptides."

What it doesn't say is that beta-alanine residues and L-histidine residues can be components of dipeptides.

1          What we are really talking about here in the

2    claim construction language is how is the language used.

3    The way the inventors used this language is to describe

4    beta-alanine and L-histidine as components, not residues

5    thereof.  That is really what we are here about today, is to

6    figure out how those terms were used and what they mean.

7          One thing I think we should do also is step back

8    for a moment.  We are in a slightly different situation here

9    where the patent holder is saying, well, we described what

10   the invention meant in our petition to make special.  And

11   it's somewhat odd because the patent holder was in the

12   unique position to draft patent claims to explain exactly

13   what they meant.

14          So it's a little odd to take one document filed

15   in the late 1990s out of this whole series of patents and

16   say that it now describes what the scope of the claims is.

17   I think that's something to keep in mind as the Court

18   considers the parties' positions.

19          One other point I wanted to make.  Plaintiffs'

20   counsel talked about the analogy of an apple and that the

21   apples lose their identity.  Not really applicable here, for

22   reasons that are actually stated in the patent.  I want to

23   show an excerpt from the '361 patent.

24          If we look here in Column 5, if we go down to

25   Line 12, actually let's look at Line 11, the

1  beta-alanyl-L-histamine dipeptides --

2       THE COURT:  Would you blow that up a little bit.

3       The first paragraph there, Line 11.

4       MR. HANSEN:  The beta-alanyl histimine dipeptide

5  is synthesized within the body from beta-alanine and

6  L-histidine.  These precursors can be generated within the

7  body or are made available by the diet, including from the

8  breakdown of an ingested beta-alanyl-histidine dipeptide.

9  That beta-alanyl-histidine dipeptide is carnosine, as we

10  described in the tutorial.

11       Actually, in this case if you eat the apple pie

12  you get the apples back in the bloodstream.  So the apple

13  pie analogy is not really applicable here, as their own

14  teachings indicate.  I wanted to point that out.

15       One final point then, Your Honor.  The Court

16  raised the issue of the Genentech case and whether there is

17  multiple definitions.  We want to make clear that our

18  position is there are not multiple definitions.

19       THE COURT:  I think that's why you

20  distinguished --

21       MR. HANSEN:  Exactly.  Our position is it is a

22  single definition which describes multiple forms in which --

23       THE COURT:  I was being inartful in my questions

24  to Mr. DiGiovanni.  I do understand him on that.

25       MR. HANSEN:  I wanted to clarify that point.

1        Thank you, Your Honor.

2        THE COURT:  Mr. Chambers.

3        MR. CHAMBERS:  Your Honor, I am afraid we are

4    going to have to re-plow a little bit of ground because I

5    consider later applications in the same family to be

6    extrinsic evidence, and I didn't cover some of the other

7    areas where they dealt with that.

8        The reason for that --

9        THE COURT:  Let's make clear your position,

10   because I thought when I was first discussing the whole

11   notion of extrinsic evidence, I thought it was the

12   plaintiffs' position that if the patents were from the same

13   family you didn't consider it to be extrinsic.  When you

14   stood up to object and when that was pointed out by Mr.

15   DiGiovanni that it was from the same family you didn't

16   pursue the objection.

17       MR. CHAMBERS:  Your Honor, exactly.  I had

18   thought that what we were saying was that something that

19   came after the patent issued was extrinsic.  And that's why

20   I didn't put this into my stuff.  That's why I was going to

21   object.  But then after he raised it and you made the point

22   that, well, if it is from the same family we will let it in,

23   I thought that there wasn't an issue.  Part of the reason

24   for this is that defendants in their brief indicated that

25   there was a particular application that became a patent.

1    And they said it was in the same family.  It's not in the

2    same family.  And we were ready to show that it wasn't in

3    the same family.

4            But that's not the application and the patent

5    that they spoke about.  That was a different one.  You can

6    find it in the brief and we can show why, even though it's

7    on the front of the patent claiming to be in the same

8    family, the prosecution history of that patent makes it

9    clear --

10           THE COURT:  But that's not this patent that --

11           MR. CHAMBERS:  Exactly.  I will re-plow a little

12   ground.  First I want to cover that Claim 3 that was in the

13   '361 patent.

14           Claim 3 in the '361 is unusual because it

15   doesn't say the way we often talk in patent law.

16           Usually in patent law, we will say something

17   like it comprises, the invention comprises, or that the

18   invention -- I will have to switch over.  Let's just look at

19   this particular Claim 1 here.  We will blow it up.

20           The composition comprising a mixture of creatine

21   composition comprising an amino acid, an active derivative

22   of the beta-alanine, an ester of beta-alanine or amide of

23   beta-alanine, that is Claim 1.  That claim itself can issue.

24   That claim was determined to be something that was

25   patentable.

1                    THE COURT:  It's an independent claim.  Right?

2                    MR. CHAMBERS:  Exactly.  So if you add an

3  additional limitation to a dependent claim, you can get that

4  allowed.  There was a suggestion or a statement that, well,

5  they say here that they disclaimed dipeptides, but you find

6  it in Claim 3.  It's true you find it in Claim 3.  You gain

7  the ability to get the patent in Claim 1, and then you add

8  something further.  In this particular claim construction,

9  in this particular claim, it doesn't say something that the

10  composition of Claim 1 wherein beta-alanine is a dipeptide.

11  It says where a composition further comprises, has addition

12  to it.  If you look at their particular --

13                    THE COURT:  I get that point.

14                    MR. CHAMBERS:  Okay.  When they substituted

15  in -- well, it's really saying that in addition to the

16  beta-alanine you have this dipeptide.

17                    THE COURT:  It's a term of art.  I understand it

18  well.

19                    MR. CHAMBERS:  You also see that same

20  construction there for Claim 2 further comprises

21  L-histidine.  So it has something extra.

22                    But look at Claim 4.  It says the composition

23  where the creatine is creatine monohydrate.

24                    So they knew how to make that narrowing

25  definition that you commonly find in patent law that leads

1       to claim differentiation.  This isn't claim differentiation

2       in the same way.  This is saying that for the first claim

3       you claim the beta-alanine and then anything you want to put

4       in beta-alanine is still in that big genus.

5               For Claim 3 not only do you have to have

6       beta-alanine, but you have got to also in addition to

7       beta-alanine have to have a dipeptide and oligopeptide or

8       polypeptide.  On Page 44 of their presentation --

9               THE COURT:  The citation to Phillips?

10              MR. CHAMBERS:  -- where they substituted in the

11      meaning of the term.

12              THE COURT:  I am not sure where that is.

13              MR. CHAMBERS:  I thought it was Page 44 of their

14      prosecution --

15              THE COURT:  You mean their slides?

16              MR. CHAMBERS:  In any event, Your Honor, the

17      examiner did not know did not misunderstand what a dipeptide

18      was.  The examiner knew exactly what a dipeptide was.  It

19      was saying that this was the dipeptide.  Then further you

20      had beta-alanine, but it was something in addition.

21              I am sorry, it was Page 17.

22              Here it says, The composition of Claim 1 wherein

23      the individual amino acid beta-alanine or its salt ester or

24      amide further comprises a dipeptide.  All that is saying is

25      that that particular composition further includes or has to

1    have in addition a dipeptide, an oligopeptide, or a

2    polypeptide.  That is all that that means.

3            Now, they suggested that the disavowal is for

4    all of the subject matter forever.  And our position is that

5    when you disavow something, you are disavowing the claim

6    terms.  You can go back and you can actually claim material

7    that was another embodiment in the patent when you filed it.

8    This patent has many embodiments.  Some of those embodiments

9    were dipeptides.  And later patents actually claim those

10   dipeptides.

11           But we are talking about what the claims in the

12   patent in suit mean, not whether or not they have disclaimed

13   something so that they can never resurrect it in a

14   subsequent patent.

15           THE COURT:  I am just curious.  We don't get to

16   make policy.  What do -- I will get both of you up here --

17   what do you imagine the Federal Circuit and the Supreme

18   Court, more importantly, perhaps the United States Congress,

19   the framers of the Constitution intend patents, what is

20   their option?  It is to perform a public notice function --

21   right -- to those of skill in the art as to what the metes

22   and bounds of a particular property claim are.  Right?

23           So in analyzing that -- and Vitronics picks up

24   on this and many other cases, Phillips certainly re-embodies

25   and does not in any way diminish Vitronics, says to us

1 that -- and this has to do with extrinsic evidence,

2 understanding that the prosecution history is part of the

3 intrinsic record.  Nonetheless, what do people skill of

4 skill in the art typically do?  Don't they read the claims

5 and the written description to try to understand where the

6 parameters are?

7     How involved in the prosecution history, in

8 analyzing the prosecution history, things like disclaimer,

9 prosecution history estoppel, must one of skill in the art

10 get in order to determine whether he or she can avoid the

11 patent or design around or things that are appropriate to

12 do?

13     MR. CHAMBERS:  I think that the claims put

14 someone on notice.  As we all know from looking at opinions

15 of counsel for freedom to operate opinions and things like

16 that, the Federal Circuit has said that a freedom to operate

17 opinion that does not include an investigation of the

18 prosecution history is incompetent.  And so what they are

19 saying is, hey, the claims put you on notice.  And then it's

20 not like they said in years past that you should burn the

21 file wrapper so that you only have those claims.  You look

22 at the claims, the specification, and then you ask, do I

23 still have an issue?  And if you do, then you are going to

24 want to say, okay, I better have a trained professional look

25 at this because otherwise, there might be an issue.

1          So I think, you know, Congress put this out.

2    And, yes, they want to advance science and the useful arts

3    and they want to encourage patents.  But they know that

4    sometimes scientists don't always speak with the same

5    language that is the vernacular for everyone else.  So if

6    you can get it from the specification, that is fine.  But if

7    there is any doubt, you better go to the prosecution

8    history.

9          THE COURT:  I certainly agree with you on that.

10   How could I not?  But I worry a little bit for skilled

11   artisans insofar as -- sure, go out and get a competent

12   legal opinion.  Get a good outfit to sit down.  But even the

13   best may not be able to anticipate the intricacies, the

14   creativity of good advocates like yourself who come later on

15   and say, We disclaimed.

16          It just seems to me to be a really slippery

17   slope.

18          That is a discussion perhaps for a class of mine

19   or another day.

20          Go ahead.

21          MR. CHAMBERS:  Your Honor, I guess the issue

22   really is, given what was said in that JA73 and 74, where

23   they said that the beta-alanine and the L-histidine were

24   monopeptides, they said that twice and then they distinguish

25   it over the dipeptides, I don't see how for that particular

1  claim there can be any doubt that they were disclaiming it.

2  Now let's look at Slide 18, Mr. McKeague, and

3  also your Exhibits B and C.

4  In patent law we all know you can't get a second

5  patent if you have already gotten a patent for the first

6  thing, unless you file a terminal disclaimer.  It's called

7  double patenting.  In a later filed application, not one of

8  the patents in suit but within the same family, it was a

9  CIP, and it's the one we have been speaking about, in those

10  particular later filed applications, it's not, as the

11  defendants said, that this issue wasn't raised more than

12  once.  This issue came up.  But the issue came up in a way

13  that makes it pretty clear, that makes it absolutely clear

14  that they were disclaiming the dipeptides.

15  Now, in that later filed application, the patent

16  examiner said that the patents in suit and that the claims

17  of these patents in suit compared to the CIP were either,

18  one, obvious variants, or if they weren't obvious variants

19  they were something that still had to be practiced in order

20  to perform the CIP claims because the CIP would be required

21  to do them but it would allow additional materials to be

22  added.

23  How do I get rid of this little red mark that is

24  on here, Your Honor?

25  THE COURT:  That is your presentation.  I don't

1    know.

2          MR. MOORE:  There may be a way to clear the

3    screen.

4          MR. CHAMBERS:  We can talk around it.

5          The examiner said in the patent prosecution that

6    we are talking about here, said that the claims were either

7    obvious variants of the patents in suit or you couldn't

8    practice the claims of this CIP without practicing the

9    patents in suit because in those particular patents in suit

10    it allowed additional nonspecific additions.

11          Let's look what it says.  He rejects it.  Then

12    we have got these three patents up here are the patents in

13    suit.  They are not patentably distinct from each other

14    because either one set of claims is obvious over the

15    variants of the other claim sets or a skilled artisan would

16    not be able to practice the invention of the claims set

17    without practicing the invention of the other claim sets in

18    particular because the transition phrase "comprising" --

19          THE COURT:  Can't see it.

20          MR. CHAMBERS:  Thank you. -- "comprising

21    employed in the claim sets which allows additional

22    non-specified elements covering the claim."

23          Now, that means two very important things, Your

24    Honor.  The first is that the examiner did not see these

25    claim sets as ADOP.  He didn't see them as amino acid,

dipeptide, polypeptide or oligopeptide.  Otherwise, they
wouldn't be obvious variants.  But they would be covering
the same subject matter.  In other words, you would have an
"I claim this in one and I claim that in the other one."

And there is a second thing that's taught.
These earlier claims did not claim the dipeptides because
they only rendered the claim obvious due to additional
nonspecific additions.

In other words, it wasn't that beta-alanine
included ADOP.  It was beta-alanine.  It was a comprising
claim.  So it was open-ended.  That's what made the examiner
say, wait a minute.  This is not acceptable.  In other
words, if ADOP were correct, the dipeptide would not be what
the examiner called additional nonspecific additions because
of the comprising, but would already be something that was
there in the claims.

Then the applicants filed their response.  And
for each one of the patents the applicants went through and
they said none of the methods of Claims 1 through 11 of the
'596 patent recite or encompass a composition that contains
a mixture of creatine, anserine or balenine.  Those are the
dipeptides.  So none of those contain that.  That is for the
'596.

For the '098, they say neither Claim 3 nor Claim
4 of the '098 patent recites a composition that includes a

1      mixture of creatine, anserine or balenine.

2                And for the '361 patent, they say that none of

3      the claims recite a dietary supplement that includes a

4      mixture of creatine and the dipeptides.  So once again they

5      were disclaiming the dipeptides.

6                Now, if you look at that response, they indicate

7      that dipeptides are not encompassed by the earlier patents

8      no less than ten times.  You can find that, that is the

9      McKeague declaration, Exhibit C.

10               So we think that it was clear the first time

11     when Setra said -- when they said Setra teaches dipeptides,

12     if it meant ADOP, it's 102 anticipation.  You can't issue

13     that.  We think the examiner knew what he was doing.  He was

14     just being very precise in analyzing what was there.

15               Now, there seems to be some issues regarding

16     Genentech.  The Court has indicated an interest in

17     Genentech.

18               THE COURT:  Only because the parties cite it.

19               MR. CHAMBERS:  We believe Genentech would apply

20     if you consider there to be multiple definitions.  We think

21     that the disclaimer is pretty clear.  We think that --

22               THE COURT:  Do you consider there to be multiple

23     definitions?  Do you agree with the defendants that there

24     are not multiple definitions?

25               MR. CHAMBERS:  Your Honor, what we believe is

1  there aren't multiple definitions, it is clear.  But even if

2  there are, Genentech says it should go a certain way.

3          THE COURT:  Genentech, the Court there was

4  dealing with multiple definitions.  And they made it clear

5  that that is what they were dealing with.  If you are in

6  agreement, I don't have to re-read Genentech again.  It's

7  not an issue.

8          MR. CHAMBERS:  Your Honor, they say that

9  Genentech went down to structural issues.  We believe that

10 these are structural issues, too.  The definition of

11 beta-alanine just like in Genentech --

12         THE COURT:  That is what the Court did in order

13 to discern the meaning of the terms at issue.  The principal

14 issue, it seems, is there is no disagreement between the

15 parties or at least the present situation is --

16         MR. CHAMBERS:  Your Honor, we don't

17 believe there are multiple definitions.

18         THE COURT:  Counsel, don't interrupt.  I am

19 going to interrupt you from time to time, but that's what

20 judges do.

21         Tell me if you disagree.  It sounds to me like

22 there is agreement among the parties that Genentech really

23 doesn't apply in this case because there are not multiple

24 definitions.  Yes or no?

25         MR. CHAMBERS:  I agree, Your Honor.

1          THE COURT:  We don't need to talk about

2  Genentech anymore.

3          MR. CHAMBERS:  We believe, Your Honor, there is

4  one definition -- when you file an application --

5          THE COURT:  Go back to the podium, counsel,

6  unless you need to use the Elmo.

7          MR. CHAMBERS:  I have just blanked.  I should

8  have stayed up there at the Elmo.

9          THE COURT:  Go back.  It may jog your memory

10  somehow.

11          I know the feeling.  Take your time.  You were

12  talking approximately Genentech and...

13          MR. CHAMBERS:  I am sorry, Your Honor.

14          When you file an application at the Patent

15  Office, you file it, and then many months later it gets

16  acted on even if you file a petition to make special.  You

17  have crafted a particular application, you file it, and then

18  during prosecution you will narrow the claim, you will

19  narrow what you are going after.  And that's why prosecution

20  history is very important in finding out what the applicant

21  eventually intended or eventually obtained.

22          THE COURT:  Counsel, I understand prosecution

23  history.  I really do.

24          MR. CHAMBERS:  Counselor has indicated that

25  Phillips doesn't say -- or says that the lexicography

1   governs.  Phillips is very clear about the prosecution

2   history, the importance of the prosecution history.

3           THE COURT:  Wait a minute.  Phillips doesn't say

4   anything different that hadn't already been said previously

5   regarding lexicography.  Do you disagree with Mr.

6   DiGiovanni's statement of the legal proposition?

7           MR. CHAMBERS:  If his statement of the legal

8   proposition is if you have some ambiguous definition in this

9   the specification --

10          THE COURT:  That is not what he is saying.  I

11  don't understand him to advance the proposition that you

12  only go to the concept of lexicography if there is

13  ambiguity.  What I believe the cases say is that the

14  applicant is free to act as his or her own lexicographer.

15          Is that your contention, Mr. DiGiovanni?

16          MR. DiGIOVANNI:  It is, Your Honor.

17          THE COURT:  Do you agree with that?

18          MR. CHAMBERS:  Absolutely Your Honor.  Then the

19  applicant is also free to narrow that definition.

20          THE COURT:  Yes, certainly, in the

21  back-and-forth, in the negotiation that occurs between the

22  examiner and the applicant, that happens.  We know that.

23  Okay.

24          MR. CHAMBERS:  Your Honor, I may have misspoke.

25  Originally, when I said Genentech doesn't apply, there is

1    another way to look at this.  And if you are saying that

2    there are multiple definitions and that the one is a

3    definition of an amino acid and the second definition is a

4    component of a dipeptide and the third is a definition of

5    how the active derivative plays in with that, then there

6    would be multiple definitions.  I don't believe that, the

7    way I look at it, that they gave a definition of

8    beta-alanine that included the residues in those dipeptides

9    in terms of the claims of the patents in suit.

10                   THE COURT:  Who is "they"?

11                   MR. CHAMBERS:  The inventors.

12                   THE COURT:  But I was only trying to understand

13   your position for purposes of this exercise as to whether

14   there are multiple definitions.  And that was the context of

15   Genentech, I thought.  I thought you said, No, there are not

16   multiple definitions being advanced by the plaintiff.  Is

17   that your position?

18                   MR. CHAMBERS:  That's correct, Your Honor.  But

19   if the Court construes it as there is a definition that it

20   is an amino acid and a definition that it is the residue of

21   a dipeptide, then, under that consideration or under that

22   analysis, I would say, okay, yeah --

23                   THE COURT:  I will make it clear in a footnote

24   or two in my order as to whether I am applying Genentech.  I

25   will try to do that.  I don't think I am going to have to go

1       there.  But go ahead.

2                MR. CHAMBERS:  Finally, Your Honor, the claims

3       that were spoken of by the defendants dealing with the '294

4       patent, those are claims that don't even use the term

5       beta-alanine and don't even use the term L-histidine.  Those

6       are claims that don't go there.  So I don't see how they

7       help to illuminate what beta-alanine means or L-histidine

8       means.  Instead, those claims address dipeptides and

9       indicate very clearly what's being claimed.

10               With that --

11               THE COURT:  Here is what I am going to do.  We

12      can't spend as much time on other terms.  But my sense is

13      that this is, as it were, sort of where the rubber meets the

14      road in this case, these three terms we have been talking

15      about.  So I am going to do something I don't typically do.

16      I am going to let Mr. DiGiovanni respond.  And then I will

17      give you the last word.

18               MR. DiGIOVANNI:  I appreciate that, Your Honor.

19      Thank you very much.

20               I will start by addressing your question about

21      the public notice function and Congress and the Supreme

22      Court.

23               I certainly agree that the public notice

24      function is of critical importance.  I think Congress is

25      currently debating this American Events Act and looking to

1   protect American companies and other companies around the

2   world when it comes to inventing and having a good

3   understanding of what is already patented and how to avoid

4   patents, et cetera.  So the public notice function is

5   critical.  That is why the Federal Circuit has stated that

6   when you have a prosecution history statement, it needs to

7   be clear and unmistakable.  I think Mr. Chambers on several

8   occasions said, I think it's pretty clear that...  That

9   doesn't cut it.  Even if it were pretty clear, we certainly

10  don't agree that there was anything even close to pretty

11  clear or clear or even a disclaimer.

12          There just was no disclaimer that was clear and

13  unmistakable that a person of ordinary skill in the art in

14  reviewing the entire file, the patents, and the prosecution

15  history would understand that, in fact, these particular

16  inventions that were covered by the express definition were

17  excluded.  An inventor wouldn't do that, especially in view

18  of Claim 3, Your Honor.

19          I want to go back to Claim 3.  Let me just make

20  a switch here.

21          We have up on my Slide 36.  Going back to this

22  Claim 3 situation, this slide, while it doesn't show Claim

23  1, Claim 1 talks about a composition that further comprises,

24  and goes on and describes it.  Claim 3 doesn't say where the

25  composition further comprises a dipeptide.  Claim 3 says,

wherein the beta-alanine further comprises a dipeptide,

oligopeptide, or polypeptide.

There is no way to read that without coming to

the conclusion that, well, that means a beta-alanine.  As

that term is used by the inventors, there is no way to read

that without understanding that beta-alanine does, in fact,

encompass beta-alanine as a component of the dipeptide and

oligopeptide and polypeptide.

I think what plaintiffs argued was -- and I am

not completely sure this is what they argued -- but

apparently they are saying you have a beta-alanine, and then

you have something else attached to it, then you have

something else.  And they say, well, that would still be the

beta-alanine individual molecule.  No, it certainly

wouldn't.  Their definition would expressly preclude the

beta-alanine from being called beta-alanine because their

beta-alanine says it has to be by itself.

Once you have beta-alanine further comprising a

dipeptide, once it's part of that bigger chain, then under

their definition it is no longer beta-alanine.  Well, that

is completely inconsistent with Claim 3.

So going back to the public notice function and

the rules of claim construction, there is a requirement that

all the claims need to make sense.  And their construction

completely destroys that.

1          Just a couple other points.

2          The CIP application, Your Honor, I think they

3    are arguing for an after-the-fact reverse disclaimer.  In

4    these earlier patents, you can't do that.  I don't

5    understand their later arguments to have any effect on claim

6    construction.

7          And the arguments had nothing to do with the

8    definition of beta-alanine that a person of ordinary skill

9    in the art would understand in reading their patent, where

10   there is an express definition and reading the claims and

11   the prosecution history.

12         And then I don't need to address Genentech, Your

13   Honor, because there is one definition, and the definition

14   is up on the poster board, because we adopt ours directly

15   from the inventors' definition, and I just don't see how

16   that can be multiple definitions.

17         I think that's all I have, Your Honor.

18         THE COURT:  All right.  We will give Mr.

19   Chambers the last word on this round.

20         MR. CHAMBERS:  Your Honor, just two minor

21   points.  I am sorry for my Midwestern upbringing that makes

22   me say "pretty clear" rather than "clear."  I think it's

23   quite clear.

24         But in addition --

25         THE COURT:  Is that a unique feature to

1    Midwesterners?

2              MR. McKEAGUE:  It is, Your Honor.

3              THE COURT:  We have got some affirmation here.

4              MR. McKEAGUE:  It is.

5              MR. OPARIL:  It is extrinsic evidence, Your

6    Honor.

7              (Laughter.)

8              MR. CHAMBERS:  Your Honor, when they say that

9    the beta-alanine further comprises a dipeptide, the other

10   way to look at that is that the beta-alanine is a dipeptide

11   of beta-alanine and it's not the carnosine dipeptide, in

12   other words, that it can be two beta-alanines linked

13   together.  So we don't see that this precludes having Claim

14   1 address just that it's just the amino acid.

15             In addition, one of the things that I had needed

16   to address earlier was that when they had indicated that the

17   present invention provides for dipeptides, peptides, and

18   peptide analogs, as explained in our brief, Your Honor, that

19   is referring to the invention and what goes on in the

20   muscles and what goes on in the cells.  That is not saying,

21   you know, that this is addressing the particular way that

22   you interpret the claims.

23             THE COURT:  All right.  Why don't we take a

24   bio-break and come back in a few minutes.

25             (Recess taken.)

1          THE COURT:  Please take your seats.

2          I am hoping we can get through the rest of this

3     by 1:00.  That would be my preference, quite frankly.

4          MR. CHAMBERS:  I believe we can.

5          THE COURT:  All right.

6          MR. CHAMBERS:  The next term that we are going

7     to consider, Your Honor, is dietary supplement.

8          We believe dietary supplement means in addition

9     to the normal diet, in the form of a pill or capsule,

10    tablet, a powder or a liquid form, which is not a

11    conventional food and effectively increases the function of

12    tissues.

13         Now, dietary supplement must be construed.  If

14    you look at the --

15         THE COURT:  There is a disagreement among the

16    parties over that.  Right?

17         MR. CHAMBERS:  Yes.  The defendants have

18    indicated that it shouldn't be construed because --

19         THE COURT:  It's in the preamble.

20         MR. CHAMBERS:  -- it's in the preamble.

21         However, looking at the actual patent, you find

22    that Claim 1 and Claim 5 are exactly the same except for the

23    term dietary supplement and composition.  I have highlighted

24    those for Claim 1 and Claim 5.

25         You find that same issue for Claim 10 and Claim

1  17:  composition and dietary supplement.

2          Finally, in 22 and 25, it simply says dietary

3  supplement.  That is the only change in those terms.

4          If dietary supplement did not have meaning, the

5  Patent Office would have been issuing not only two claims to

6  exactly the same thing, exactly the same invention, but

7  three sets of claims to exactly the same invention.  They

8  would have done this three times.  We don't believe that

9  that is the case.

10          In addition, we believe that dietary supplement

11  is very important for the claim term.

12          The second and third paragraphs of the patents

13  in suit describe dietary supplements.  These are typically

14  not conventional food.  Specifically, the patents in suit

15  disclose the importance of supplements to compensate for the

16  reduced levels of nutrients in the diet.  For example, at

17  Exhibit 3, Joint Exhibit 3, Column 1, Lines 18 through 21,

18  that demonstrates that the applications are intended that

19  the supplements of the invention are something other than

20  simply conventional food because they were intended to

21  compensate for reduced levels in the diet.

22          In addition, conventional foods like meat and

23  animal products can't be used as a supplement to diets of

24  certain people like vegetarians, it is something that the

25  patent is not saying to use conventional foods to alleviate

1    these issues, but to use a dietary supplement.

2              For example, in Exhibit 3, Column 3, Lines 54

3    through 59, it says that you lose some of these with

4    conventional cooking.  Beta-alanine only comes from animals.

5    So you wouldn't be getting it if you were a vegetarian.

6    It's got to come from a dietary supplement, something that

7    is not conventional food.

8              Now, when referring to natural foods, the

9    patents don't call them dietary supplements.  For example,

10   at JX-3, Column 11, Line 56, it refers to chicken broth as a

11   natural food, not as a dietary supplement.  These substances

12   are not food themselves.

13             In addition, when they are adding the

14   beta-alanine amino acid to feed, they say that these

15   substances were added to the feed.  And if they were

16   actually feed themselves it wouldn't be stated that way.

17             If you went to a pharmacy, Your Honor, and asked

18   for a dietary supplement, and the pharmacist said you can

19   get chicken breasts over in Aisle 4 and broccoli over in

20   Aisle 3, you would think he misunderstood you.  That is not

21   the way people normally use the terms.  This is something

22   that needs to be construed because the Patent Office doesn't

23   issue multiple claims for the same invention.

24             We will hear from the defendants now?

25             MR. HANSEN:  Your Honor, we have on the screen

Slide 48. What we have done here is on the left-hand side
we have shown defendants' construction, on the right-hand
side, plaintiffs' construction. And then what we have done
on each side is explaining the parties' positions.

As plaintiffs' counsel pointed out, there is two
key issues here. The first is do we even get to the
construction issue. We contend that we do not, because
dietary supplement is not a limitation.

The second issue is if the Court decides it has
to construe the term, how should it construe it. As shown
here on Slide 48, we contend that dietary supplement is a
mere statement of intended use and it should not be
construed by the Court. And there are several reasons for
that. They are summarized here on the right, and we will go
through them individually.

First, it's recited only in the preamble, and
the bodies of the claims do not refer back to the term.

Second, the phrase dietary supplement was not
used to distinguish the prior art in the prosecution of the
'361 patent, which is the patent in which the term appears.

And finally, the specification does not
demonstrate that the term dietary supplement is a necessary
and defining aspect of the invention. It merely says that
the composition can be a dietary supplement.

When we are looking at the specification, we

have to take a look at whether we have words that are

mandatory or requirements versus just words that describe

possible embodiments.

We have reprinted the claims from the '361

patent here just to illustrate with the yellow highlighting

that dietary supplement does indeed occur only in the

preamble.  This term "comprising" is known as a transition

word in patent claim drafting, and dietary supplement occurs

in the preamble, and there is no subsequent reference made

to it after the word comprising.  That doesn't seem to be in

dispute.

The phrase dietary supplement was not used to

distinguish the prior art in the prosecution of the '361

patent.  Now, the Federal Circuit has certain recognized

circumstances under which a preamble may be limiting.  One

of them is if the preamble is subsequently referred to in

the body of the claim.  As we just explained, that is not

true here.  One of the other ones is if the preamble is used

to distinguish the prior art.  And again, that wasn't the

case here.  And so, not surprisingly, we didn't see anything

from the plaintiffs showing that there was any mention made

of it.

So the plaintiffs in their briefing seem to

hinge their argument on the fact that the dietary supplement

phrase is a necessary and defining aspect of the invention.

1   We have excerpted the quote from the brief here on Page 13

2   of the opening brief.  Really, the specification doesn't say

3   that.

4          What we have done on Slide 51 is we have

5   excerpted places in the specification that refer to the term

6   dietary supplement.  Column 3, Line 40, The composition can

7   be a dietary supplement.  At Column 5, Line 55, The

8   composition can be ingested as a dietary supplement.

9          These are not words of exclusion or requirement,

10  the type of words that the Federal Circuit typically looks

11  to when they are saying that the claims should be limited to

12  something in the specification.  And it doesn't indicate

13  that the use of this as a dietary supplement is a necessary

14  or defining aspect of the invention, despite the plaintiffs'

15  suggestion otherwise.

16         Now, I want to address one of the points that

17  plaintiffs' counsel made initially, which is that if this

18  term is not construed that it would render certain claims

19  identical to one another.

20         And just to refresh the Court's recollection,

21  counsel showed the claims of the '361 patent, and there is

22  actually sets that say composition and dietary supplement,

23  and those sets have the same limitations in the body of the

24  claims.

25         And what counsel said is, well, if you accept

defendants' contention that the preamble not be construed, these pairs of claims would be rendered identical.  We don't disagree.  The bodies of the claims are the same.  So if the preambles are not limitations, they would be the same.  The question is what is the import of that.

Now, plaintiffs' counsel also said the Patent Office doesn't issue patents with the same claims in them. There is a rule in the Patent Office that you are not supposed to issue the same claim twice in the same patent.

But it's a Patent Office rule.  The Court would not be rendering the claims invalid by failing to construe the preamble.  It would merely be saying that in this instance the Patent Office rule was not adhered to.

Now, the Federal Circuit has laid out the circumstances under which we are to treat a preamble as a limitation.  And as we said, it's when it's referred back to in the body or when it's described as a defining and necessary aspect of the invention or when it's used in the file history.

In our view, this consideration that some claims might be rendered duplicative simply doesn't trump those Federal Circuit principles.  If it turns out that the claims are duplicative, well, then, the examiner should have handled it differently and required them to put something in the body of the claim to make the thing actually a dietary

1    supplement.

2              THE COURT:  Is it always the case -- maybe this

3    isn't exactly that.  I am trying to remember the Federal

4    Circuit precedent that says when a Court is presented with a

5    dispute it must resolve the disputed definition of claim

6    terms.  This isn't exactly that situation, is it?

7              MR. HANSEN:  I don't think the Court needs to

8    resolve the construction dispute if as a threshold matter it

9    finds the preambles are not limiting.

10             THE COURT:  If I don't find that threshold, I

11   would to resolve that.

12             MR. HANSEN:  Then I believe if there is an

13   actual dispute, it would have to be resolved.

14             THE COURT:  All right.

15             What would be wrong with, if I did determine

16   that it needed to be resolved, that there was a dispute ,

17   the plain and ordinary meaning of dietary supplement?

18             MR. HANSEN:  Well, then, the fact-finder is

19   going to look at individual pieces of prior art and

20   conclude, make some determination as to whether the thing is

21   a dietary supplement as opposed to something that just has

22   what's in the body of the claim.  I don't know what that --

23   I don't know how they are going to make that determination

24   if it was just left unconstrued.

25             THE COURT:  Well, the construction would be its

1    plain and ordinary meaning.

2         MR. HANSEN:  The problem is that that plain and

3    ordinary meaning would further limit the claim, and the

4    fact-finder might say that certain pieces of prior art are

5    not invalidating because they have applied that plain and

6    ordinary meaning.

7         The thing I just wanted to emphasize here is

8    that plaintiffs' argument about the import of this rendering

9    certain claims redundant is somewhat inconsistent with their

10   other position.  How can it be the case that dietary

11   supplement is a necessary and defining aspect of the

12   invention if in the same patent they included claims that

13   just say a composition?

14        This seems to be the principle that they are

15   relying on in the first instance to warrant limiting the

16   claims to the preamble.  And yet the fact that they recite

17   composition claims which don't even use the words dietary

18   supplement seems to undercut that position.

19        So if the Court is inclined to construe the

20   term, then the question is, how should it?  And that's what

21   we are going to look at in the next set of slides.

22        Okay.  Here again we have repeated the

23   construction, so we contend that a dietary supplement is a

24   product or substance that is added to the diet.

25        Plaintiffs contend it's in addition to the

normal diet, a pill, capsule, tablet, powder, or liquid

form, which is not a conventional food, and effectively

increases the function of tissues when consumed.

Why do we think our construction is correct?

First, the parties agree that a dietary supplement at least

includes the idea that it is something added to a diet.  On

that point, we don't seem to disagree.  The specification

confirms that dietary supplements are products or substances

added to the diet.  It doesn't expressly define the term.

But in the way that it's used it suggests they are things

added to the diet.  And further dictionary support the

defendants' construction.

I understand the Court would at least entertain

that limited form of extrinsic evidence.  If not, let me

know, and we will skip it when we come to the slide.

Why do we believe the plaintiffs' construction

is wrong?  First of all, the specification does not limit

dietary supplement to those that are consumed, and yet their

construction suggests they must be consumed.  Plaintiffs'

construction excludes or reads out a particular portion of

Example 2 in which a chicken broth was used as a means of

providing dietary supplementation.  And the language of the

example itself shows that, and we will get to that in a few

moments.

Plaintiffs' construction also limits dietary

supplement to specific forms of dietary supplements, pill,
capsule, tablet, powder, or liquid, even though the
specification doesn't warrant limiting the term to a
particular form.

We also believe the specification does not limit
dietary supplements to those that increase the function of
tissues nor does it limit the invention to vegetarian diets,
to nonconventional foods.  These are the summaries.  We are
going to go through these individually.  I wanted to preview
them before we jumped into the individual slides.

Quickly, here is the language from the beginning
of plaintiffs' construction that a dietary supplement is in
addition to the normal diet.  We say it is a product or
substance that is added to the diet.  We both seem to agree
that you add something to the diet as part of the
construction.

Slide 54, we show that the specification
confirms that dietary supplements are products or substances
added to the diet.  In Column 1 it says natural food
supplements are typically designed to compensate for reduced
levels of nutrients in the modern human and animal diet.

Column 6, Lines 56 to 60 of the '361, shows an
example.  During the supplementation period, an identical
feeding regime was implemented.  However, each hand-fed meal
was supplemented with beta-alanine and L-histidine.

1          The term, in the sense that it's used, it's

2     something that is added to the diet.

3          The next slide is a dictionary definition.  I

4     don't know --

5          THE COURT:  Sure.

6          MR. HANSEN:  Here we have two dictionary

7     definitions from the declaration of Mr. Walter, Exhibit D in

8     his first declaration.  Dietary is used as an adjective.

9     Supplement is used as a noun.  So we see the dietary

10     adjective form, of or relating to a diet, or the rules of a

11     diet.  Then the noun form of supplement, the first

12     definition is something that completes or makes an addition.

13     And it actually uses dietary supplements in that particular

14     definition as an example of a type of supplement.

15          We believe that these dictionary definitions

16     further support defendants' construction that a dietary

17     supplement is simply proper substance added to the diet.

18          With that, let's look at why we believe

19     plaintiffs' construction is incorrect.  On Slide 56 we

20     provide the first reason.  The specification does not limit

21     dietary supplements to those that are consumed.  We believe

22     that the word consumed to a fact-finder would ordinarily

23     connote some sort of taking it in orally.  We believe that

24     that implication is not warranted because in several places

25     the specification makes clear that the compositions can be

provided by ingestion or infusion, e.g., injection. That is

from Column 3 of the '361 patent. And the composition can

be administered orally, enterally, through the digestive

tract or parenterally, outside the digestive tract.

Similarly, in Claims 9, 21, 34 of the '361

patent, they all describe the dietary supplement as being an

injectable formulation. We believe that this consumption

limitation suggests otherwise in plaintiffs' construction.

So we believe that it's improper to construe

this claim in a manner that's inconsistent with these

excerpts from the specification.

Just to be clear, this fourth claim here at the

bottom of Slide 56 is from the '084 patent, not one of the

three patents in suit. It is in the family that Mr.

DiGiovanni referred to in his presentation.

All right. Next reason we believe plaintiffs'

construction is incorrect is that it excludes or reads out

the chicken broth of Example 2. Now, I believe during

plaintiffs' presentation it was stated that the chicken

broth is not described as a dietary supplement, it's only

described as a natural food in the patent. We don't agree

with that, because of the language that is highlighted here

on Slide 57. Slide 57 says, it's discussing that Example 2

discusses the effect of supplementation of a normal diet.

And to show that effect, one of the experiments that was

done is to provide a chicken broth to patients, and then

have them ingest it, and then determine in their blood what

the concentration of free beta-alanine was.

So the way that the terms supplementation of a

normal diet are used in Example 2 in direct linkage with the

consumption of a chicken broth seems to us to compel the

conclusion that chicken broth is being used as an example of

a dietary supplement here.

If we look at Figure 8, which is a figure that

displays the data generated in Example 2, what we have done

here is highlight in blue what happened when the test

subjects ingested this chicken broth.  And this is freed --

beta-alanine in the bloodstream.  You can see from the blue

line that it went up quite a bit due to the ingestion of

chicken broth.

If plaintiffs were correct that a dietary

supplement cannot be a conventional food, then this chicken

broth example would not be within the scope of their

invention.  And as the Court knows, it's rarely correct

under Federal Circuit precedent to construe a claim in a way

that reads out a preferred embodiment.

The next issue with plaintiffs' construction is

that it limits the term dietary supplement to specific forms

in which the dietary supplement is provided:  pill, capsule,

tablet, powder or liquid.  If you searched the '361 patent

1    for the word pill, you won't find it, nor will you find the

2    word capsule, nor will you find the word tablet, nor will

3    you find the word powder.  You will find the word liquid and

4    you will find the word solid.

5           But the plaintiffs seek to define this term with

6    these specific forms that are not even disclosed in the

7    application.

8           For that reason we think it's improper as well

9    to limit dietary supplement to the forms specified in

10   plaintiffs' construction.

11          Next, plaintiffs' construction requires that in

12   order to be a dietary supplement, the material must

13   effectively increase the function of the tissues when

14   consumed.  Now, the place that they seem to get this from is

15   Column 1 of the '361 patent starting at Line 18.  It reads,

16   "Natural food supplements are typically designed to

17   compensate for reduced levels of nutrients in the modern

18   human and animal diet."

19          The next sentence reads, "In particular, useful

20   supplements increase the function of tissues when consumed."

21          That's the basis for the last limitation here,

22   "effectively increases the function of the tissues when

23   consumed."

24          We don't agree that that type of statement given

25   in the background of an invention defines what dietary

supplement means. Sure, it describes a class of useful
supplements as those that increase the function of tissues.
But other supplements may do other things. Maybe they add
something to the blood or provide things that are otherwise
missing.

But in our view that type of language is not the
type of language that is defining or limiting in the way
that plaintiffs would suggest in saying that it should be
used to construe dietary supplement.

So the next issue is, or the next thing that the
plaintiffs rely on to support their limitation to
conventional food is this excerpt from the '361 patent,
which reads that the compositions and methods can contribute
to correcting the loss of beta-alanine, L-histidine, or
creatine due to degradation or leaching of these
constituents during cooking or processing. The compositions
and methods can also contribute to correcting the absence of
these components from a vegetarian diet.

Okay. Fine. Those are possible benefits of
implementations of the invention. But that doesn't mean
that they limit the meaning of dietary supplement to a
conventional food. First of all, you can correct the loss
of beta-alanine or creatine due to degradation or leaching
by supplying more conventional food that has the desired
elements in it.

1            For example, if I eat a steak, and I don't get

2    enough of what I want in the way of beta-alanine, I can have

3    some chicken broth, according to Example 2 of the patent,

4    and that will be a way of addressing that issue.

5            So the mere fact that in certain foods there are

6    cooking losses doesn't mean that dietary supplements must

7    exclude conventional foods, as the plaintiffs suggest.

8            And finally, vegetarians obviously don't have in

9    their diet certain meat sources of beta-alanine like

10   carnosine.  Well, that is fine.  We don't dispute that the

11   invention is claimed broadly enough so that a vegetarian's

12   diet could be corrected.  But that doesn't mean it needs to

13   be limited to that circumstance.  Maybe just because a

14   particular vegetarian couldn't supplement their diet with

15   conventional foods because otherwise they wouldn't be a

16   vegetarian doesn't mean that the word dietary supplement has

17   to exclude conventional foods.

18           That is what we have on dietary supplement.

19           If the Court has any questions...

20           THE COURT:  Thank you.

21           Your response, if any, Mr. Chambers.

22           MR. CHAMBERS:  Your Honor, as pointed out by

23   defendants at JA3, Column 3, Lines 40 through 41, it says a

24   composition can be a dietary supplement.  That clearly

25   indicates that a dietary supplement is something that is

different than -- a dietary supplement is something that is different than just a composition.  They pointed out that there is a rule in the Patent Office that you shouldn't do this.  No less than three times do they seem to do this.

It is clearly something that is in dispute here because we believe it's limiting.  They believe it shouldn't even be part of the claim.

In the second and third paragraphs of the patent, they cover what dietary supplements are.  We think that when they are talking about chicken broth, they describe chicken broth, as you recall, as a natural food. That is on Line 68 of I guess JA68.  And when you're looking at Table 4, "broth" is there, but it's there as a control to show the difference between that and beta-alanine.  It is something entirely different.

In terms of Column 1, Lines 18 through 25 of Exhibit 3, under the patent law it's got to be useful to be patentable.  And so the fact that they say that this is useful, that's just saying what's known under patent law.

Chicken broth, clearly, if you look through the patent, it is not a preferred embodiment.  It is something that's mentioned and it's a control where they show the difference between beta-alanine and chicken broth, indicating that they think it's something different.  And you can find that in Table 4.

1          That's all we have on that one.

2          THE COURT:  Thank you, counsel.  Let's go on to

3     the next one.

4          MR. CHAMBERS:  One other point.

5          Claim 9, 21 and 27, where they say it's

6     injectable, if it is a conventional food, clearly, it's not

7     something that is injectable, Your Honor.  So it's something

8     that is different.

9          THE COURT:  Okay.  Which one is next for

10    plaintiff?

11         MR. CHAMBERS:  Providing an amount of

12    beta-alanine to blood or blood plasma effective to increase

13    the beta-alanine dipeptide in the human tissue means

14    supplying to a human an amount of beta-alanine by ingestion.

15    We said it was by ingestion.  We talked to the other side

16    and we proffered the idea that it was more than ingestion

17    because they had pointed out in their briefs that it could

18    also be by injection, which is infusion.  So we proffered

19    this present term that you see that it means supplying to a

20    human an amount of beta-alanine or L-histidine by ingestion

21    or infusion and therefore causing an increase in

22    beta-alanine or L-histidine in blood or blood plasma above

23    the normal concentrations found in the typically fed state

24    and thereby increasing the synthesis of beta-alanine.

25         In the simplest form, Your Honor, we see that

1   basically means providing beta-alanine by ingestion or

2   infusion to increase beta-alanine in blood above its normal

3   concentration and increase beta-alanine with histidine.

4           We have indicated in our briefs why we believe

5   that it needs those attributes.  And we will rest on the

6   briefs in that respect.  But the reason we are concerned

7   about their particular term is that we don't understand what

8   is meant by indirectly or directly --

9           THE COURT:  I have a question about that as

10  well.

11          MR. CHAMBERS:  Okay.

12          THE COURT:  They can respond.

13          Counsel, I am going to ask you not to go through

14  each of the slides.

15          MR. HANSEN:  Should I jump into the individual

16  ones?

17          THE COURT:  I think you should start off by

18  addressing the question I asked.

19          MR. HANSEN:  Indirect or direct.  That's fine.

20          THE COURT:  That is troubling.

21          MR. HANSEN:  To be clear, what we have done is

22  used the same language of the claim and have that in the

23  front.  We used it because we understood that the plaintiffs

24  were going to try to limit the route of the providing.

25  Indirect or direct covers the universe.  I don't think

it's -- that's a closed set.  I don't think there is

anything not covered by direct or indirect.  That language

just indicates, as does the limitation itself, that it can

be provided by any route.  For example, in the patents --

THE COURT:  Why not just say that?  I don't know

how you would word it.  My feeling is that perhaps directly

or indirectly will cause this fact-finder to scratch his

head and say, well, what do they mean?  You have the benefit

and the luxury of speaking to the future fact-finder.  You

don't have to worry about whether a jury understands.  I am

telling you right now, I don't know what that means.

MR. HANSEN:  We could certainly live with a

modification where it just makes clear that it doesn't

matter what the route of providing is, which is what we are

trying to do here.

THE COURT:  Mr. Chambers, your view here?

MR. CHAMBERS:  Our concern is they have really

expanded it by saying indirectly or directly.  Now they are

saying it can be by any means.

This patent is about supplementation of the

diet, food supplements, and it's not about things like

exercise.  It's known that exercise increases the dipeptide

in the muscle.  Is that going to be something we are going

to be fighting over in the future?  There has got to be a

limit.

1          THE COURT:  Is exercise an issue?

2          MR. HANSEN:  The claims we are talking about,

3    these are method claims.  They don't have dietary supplement

4    in them.  Even though the specification may speak to that --

5    for example, one of the asserted claims that recites this

6    limitation is Claim 1 of the '596 patent, and it's got two

7    limitations.  One of them is the limitation that is on Slide

8    61, and the other one is that you expose the tissue to the

9    blood or blood plasma whereby the concentration of

10   beta-alanine and L-histidine is increased in the human

11   tissue.  It's that broadly written.

12          Now, there is no limitation on the way that the

13   providing step occurs, and we just want to make that clear.

14   If to the Court that is clear enough on the record, then we

15   are not concerned about it.  But the patent makes clear that

16   you can get -- what we are talking about here, Your Honor,

17   is what happens in the blood, not talking about what happens

18   at the point of delivery.

19          THE COURT:  Understood.

20          MR. HANSEN:  The patent explains that you could

21   ingest the single amino acid beta-alanine and it would go

22   through the digestive tract into the blood, but you could

23   also ingest carnosine, and it will break down into the

24   single amino acid, beta-alanine and L-histidine, and get to

25   the blood.  If you inject it, it goes directly to the blood.

1   If you ingest it, it goes indirectly to the blood.

2           We were just trying to make that point, that

3   there is no limitation.  Again, if the Court thinks that

4   it's clear on this record and that we don't need those

5   terms...

6           THE COURT:  I am trying to see if there is a

7   basis for agreement here.

8           MR. CHAMBERS:  Your Honor, a claim is construed

9   in view of the specification.  When the specification is

10  going through and explaining how you supplement the diet,

11  and how you add beta-alanine to something, if somebody says,

12  well, it turns out that a little bit of exercise, like

13  walking down the street is going to do this, I don't think

14  that that is covered by the claims.

15          THE COURT:  What is your reaction?

16          MR. HANSEN:  I hadn't really considered or don't

17  know to what extent that would happen.

18          THE COURT:  I think you are both talking about

19  some form of infusion or injection, something placing the

20  supplement inside the body.

21          MR. HANSEN:  Something gets the material to the

22  blood.

23          THE COURT:  To the blood.

24          MR. HANSEN:  That is what the claim limitation

25  says.

1            THE COURT:  And not by as indirectly as

2      exercise.  That is why I keep asking, Mr. Chambers, and you

3      keep arguing.  Just tell me there is no basis for agreement.

4            MR. CHAMBERS:  There is no basis for agreement,

5      because as it turns out, Your Honor, it is definitely true

6      that the dipeptide increases in the muscle when there is

7      exercise.

8            This is a patent that is going to the

9      supplementation of the diet.  It's not going to whether or

10     not you should get up and do a couple laps.

11           THE COURT:  I think that's agreed upon.  Right?

12     This is talking about supplementing the diet of a human

13     being.  Right?

14           MR. HANSEN:  I don't know how exercising would

15     be providing something.  It's just supposed to be something

16     internal.

17           THE COURT:  I guess maybe I am not making myself

18     clear.  I don't understand why the parties can't agree.  If

19     you agree on what the invention is, its purpose, its

20     intended purpose is to supplement the diet, and let's for

21     the moment say -- well, by means of ingesting some

22     supplement or injecting it in some way into the bloodstream,

23     and that's what seems to be at issue -- Mr. Chambers?

24           MR. CHAMBERS:  Your Honor, that third

25     explanation that we had, where it was explained in its most

1    simple form, that covers exactly what you have said.  It

2    covers ingesting it, eating it, or infusing, it covers all

3    those.  And it doesn't have the problem of being direct or

4    indirect and pulling in things that we don't know where they

5    are going to go.

6              THE COURT:  Why indirect or direct?  I don't

7    understand the need.

8              MR. HANSEN:  It was simply because there seems

9    to be a dispute as to whether there is any limitation on the

10   pathway by which the material can be provided.

11             There are several other issues that I want to

12   make sure we don't skip.

13             THE COURT:  He just articulated some

14   limitations --

15             MR. HANSEN:  They are --

16             THE COURT:  Counsel, I am going to say the same

17   thing to you:  Don't interrupt the Court.

18             MR. HANSEN:  I am sorry.

19             THE COURT:  Do you disagree with that?

20             MR. HANSEN:  Yes.

21             THE COURT:  Go ahead.

22             MR. HANSEN:  Surely, the specification has

23   examples that are provided by certain routes.  But in this

24   claim they chose not to incorporate any of those particular

25   routes and to just leave it written as broadly providing an

1     amount of this material to the blood or blood plasma.

2              And we have to ask ourselves, we have to step

3     back for a second and ask ourselves:  What are the

4     circumstances under which we go into the specification and

5     use the embodiments to limit the scope of the claim?  And

6     those circumstances are when they are described in a

7     mandatory way or as a requirement of the invention or

8     something along those lines.

9              We just simply didn't see anything in the

10    specification that describes what the plaintiff is

11    suggesting as mandatory in that fashion.  Yes, it can be

12    provided by ingestion.  Yes, it can be provided by

13    injection.  Maybe there are other routes of delivery.  But

14    they chose not to limit this claim term to a particular

15    route.

16             That is really the issue with indirect or

17    direct.  But there are several other issues that I think we

18    want to make sure we get into with this particular

19    limitation.

20             THE COURT:  I am not sure there are.  But go

21    ahead.

22             MR. HANSEN:  Sure, there are.  If we look at

23    plaintiffs' construction, they are also requiring that you

24    cause an increase in blood or blood plasma of these

25    materials above normal concentrations in a typical fed

1   state.

2           Now, this limitation would require the

3   fact-finder to look at what is happening in the blood, make

4   some determination of what a normal fed state is, whatever a

5   typical fed state means, then look to see if it is above

6   that normal concentration.

7           That is nowhere in this limitation.  It simply

8   says you provide some amount of material in the blood and

9   you increase the synthesis in the tissue.

10          THE COURT:  Let me short-circuit this, because

11  it is the plaintiff who is in my mind right now swimming

12  upstream on this.  I am going to let Mr. Chambers tell me

13  why this definition doesn't work:  providing an amount, in

14  other words, adopting the defendants' definition absent the

15  words directly or indirectly.

16          You should sit down, Mr. Hansen, and let Mr.

17  Chambers take the podium.

18          MR. CHAMBERS:  Your Honor, that is just the

19  claim language.

20          THE COURT:  That's right.  Exactly.  What is the

21  matter with the claim language?

22          MR. CHAMBERS:  There is some confusion as to

23  whether or not this would embrace such things as exercise,

24  which is not something that is described in the

25  specification.  The specification goes to supplements.  And

1    since the specification goes to supplementing and providing

2    something to a normal diet --

3              THE COURT:  You know what I think that argument

4    is?  It's lawyers over-lawyering, with due respect.  We are

5    going to move on.

6              MR. CHAMBERS:  Okay.

7              Your Honor, the next term is looking at

8    increasing the concentration of insulin in the blood.  We

9    believe it means that the concentration of insulin is

10   increased by ingesting or perfusing, injecting insulin, or

11   agents that would stimulate the production of insulin.  Once

12   again, we are in a situation where we don't want to have to

13   construe in the middle of a trial indirect and direct.  We

14   are more concerned -- we rest on our briefs as to why that

15   particular construction is appropriate.  But most

16   importantly, this is something that --

17             THE COURT:  This is one where the defendants are

18   swimming upstream, Mr. Chambers.  I want to hear from the

19   defendants on that.

20             MR. HANSEN:  Your Honor, the issues here are the

21   same as on the last term.  I don't see a need to argue

22   indirect or direct.  You understand the reasons.  If the

23   Court wants to leave the claim term as it is, which it would

24   be if we just dropped those two terms, we are okay with

25   that.

1          THE COURT:  I will let you react, Mr. Chambers.

2          MR. CHAMBERS:  Your Honor, of course, if you are

3     going to accept what we have right here --

4          THE COURT:  Aren't we trying to increase the

5     concentration of insulin in the blood or blood plasma?

6     Aren't you both saying the same thing?

7          MR. CHAMBERS:  Yes.

8          MR. HANSEN:  No, because they take that basic

9     part of the limitation and then they add the method by which

10    it's --

11         THE COURT:  By which it's done.  Therein lies

12    your problem.

13         MR. HANSEN:  Exactly.

14         MR. CHAMBERS:  Your Honor, it is well known that

15    if you have a sugar pill that it's going to increase your

16    insulin level.  If you eat some carbohydrate, it's going to

17    increase your insulin level.

18         The patent even talks about increasing the

19    insulin level that way.

20         So you can either ingest or infuse insulin or

21    some agent that stimulates the production of insulin.

22    Either way, you get the same result.

23         THE COURT:  Go ahead, Mr. Hansen.

24         MR. HANSEN:  We don't disagree that the

25    chemistry as described is correct.  The issue is whether

1    that mechanism warrants limiting this claim term, which

2    speaks simply to an effect to a particular mechanism by

3    which the effect occurs.

4              THE COURT:  That's the issue, Mr. Chambers, that

5    the defendants have with your -- and I am sure your slide

6    presentation and Mr. Hansen's presentation will tell me why

7    there is no support in the written description or the claims

8    for that.  I suspect you are prepared to make that argument.

9    Right?

10             MR. HANSEN:  Yes, we are.

11             MR. CHAMBERS:  So I might as well sit down while

12   he does that.

13             THE COURT:  No, no, because I am not prepared to

14   listen to it at this point.  I understand what the argument

15   is.  I have the benefit of the presentations.  What I am

16   trying to do is get through this argument.  But if I can get

17   you to tell me, we have now put a very fine point of where

18   the dispute is.  Could you address your difference with the

19   defendants and tell me why you should prevail.

20             MR. CHAMBERS:  The patents in suit indicate that

21   you can increase insulin by --

22             THE COURT:  You need to talk to me, not him.

23             MR. CHAMBERS:  -- by providing carbohydrates.

24   You don't have to give an injection of insulin or ingest

25   insulin in order to do it.  An agent such as a carbohydrate,

1   something that is known to increase insulin, is just fine to

2   satisfy that claim term.

3           Exhibit 3, Column 3, Lines 42 through 45 --

4           THE COURT:  If I accede to your suggestion, are

5   we running afoul of one of the canons of construction and

6   importing a limitation from the spec?  That's a question.  I

7   am not saying that I am making that conclusion.  I am asking

8   you a question.

9           MR. CHAMBERS:  Your Honor, I think we are

10  expanding it.  In other words, what defendants would do is

11  they would narrow the way that you can get this insulin.

12  What we are doing is you can get it in an even broader way,

13  you can get it by giving insulin or you can get it by giving

14  some agent that will create insulin.

15          THE COURT:  With respect, Mr. Chambers, it would

16  seem that the defendants' proposal is very broad.  They are

17  saying directly or indirectly increase the concentration of

18  insulin -- that is a paraphrase -- in the blood plasma.

19  They don't place any limitations on it whatsoever.

20          MR. CHAMBERS:  Your Honor, I can increase my

21  insulin by going out for a run.  I can do things --

22          THE COURT:  Wouldn't that be an indirect --

23          MR. CHAMBERS:  That would certainly be an

24  indirect way of increasing it.  But I don't think that is

25  what the patent is talking about.  The patent only talks

1    about using these agents -- using things like carbohydrates.

2    They are not saying you go out and get yourself a two-mile

3    run and your insulin will spike and then you will have this

4    benefit.  That is not what the patents are about.  They are

5    about supplementing the diet with some kind of a dietary

6    supplement, not go out there and get some more exercise.

7              So agents that stimulate the production of

8    insulin, I think that that is actually keeping it broader

9    and yet keeping the construction of the term within the

10   realm of the patents in suit of the disclosure.

11             THE COURT:  I will take a look.

12             MR. HANSEN:  Do you want to hear from me again?

13             THE COURT:  No.  I have got the issue.  Let's go

14   on to the next claim term.

15             MR. CHAMBERS:  Your Honor, there is one other

16   term here, unit dosage.  I think we will rest on the briefs

17   for that.

18             THE COURT:  Are you comfortable with that, Mr.

19   Hansen, Mr. DiGiovanni?

20             MR. DiGIOVANNI:  Yes.  In fact, that was our

21   proposal.

22             THE COURT:  All right, counsel.  The Court will

23   reserve, take the matter under advisement.  And I should

24   have my order out more or less within 30 days.

25             Are there any other matters that you need to

1    take up with me while you are here in town?  Or are we okay?

2                    MR. HANSEN:  I think we are okay.

3                    THE COURT:  The parties are getting along well.

4    That is good.

5                    Counsel, thank you for the presentation.

6                    (Counsel respond "Thank you, Your Honor.")

7                    (Court adjourned at 12:40 p.m.)

8

9                                -  -  -

10   Reporter:  Kevin Maurer

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25